259 F.2d 346
 John L. LEWIS, Charles A. Owen and Josephine Roche, as
Trustees of the United Mine Workers of America
Welfare and Retirement Fund, Appellants,
v.
BENEDICT COAL CORPORATION, Appellee.
UNITED MINE WORKERS OF AMERICA, and United Mine Workers of
America, District 28, Appellants,
v.
BENEDICT COAL CORPORATION, Appellee.
 Nos. 13055, 13056.
 United States Court of Appeals Sixth Circuit.
 Sept. 26, 1958.
 
 E. H. Rayson and R. R. Kramer, Knoxville, Tenn. (Val J. Mitch and Harold H. Bacon, Washington, D.C., James N. Hardin, Greeneville, Tenn., Willard P. Owens, Washington, D.C., on the brief), for appellants.
 Robert T. Winston, Jr., Norton, Va. (S. J. Milligan, Greeneville, Tenn., on the brief), for appellee.
 Before SIMONS, Chief Judge, and MILLER and STEWART, Circuit Judges. STEWART, Circuit Judge.
 
 
 1
 The parties to these consolidated appeals are John L. Lewis, Charles A. Owen, and Josephine Roche, as Trustees of the United Mine Workers of America Welfare and Retirement Fund: Benedict Coal Corporation; United Mine Workers of America; and United Mine Workers of America, District 28. For economy the parties will be referred to, respectively, as the Trustees, Benedict, the International Union, and District 28 (and the latter two collectively as the Unions). The United Mine Workers of America Welfare and Retirement Fund will be referred to as the Fund.
 
 
 2
 This action originated when the Trustees sued Benedict, a coal mine operator, to recover royalties allegedly due the Fund under the National Bituminous Coal Wage Agreement of 1950 and the amendment to said agreement of 1952, with respect to coal mined by Benedict from March, 1950, to July, 1953. The agreements in question were negotiated between the International Union and an employer association representing Benedict and other employers. Under the agreements Benedict was obligated to pay the Fund thirty cents for each ton of coal it produced during part of the period involved and forty cents for each ton it produced during the remainder of the period. Cf. Lewis v. Quality Coal Corporation, 7 Cir., 1957, 243 F.2d 769. Although Benedict did make some payments to the Fund for coal mined during the period in question, it was stipulated before trial that additional coal had been mined by Benedict upon which royalties in the amount of $76,504.26 had not been paid.
 
 
 3
 Benedict's answer to the complaint denied liability upon the ground that the Trustees were beneficiaries of the 1950-52 agreement between Benedict and the International Union, that therefore any defenses, counterclaims, or set-offs which Benedict had against the International Union were available against the Trustees, and that the International Union had breached the agreements by causing a series of strikes, all of which were in violation of the agreements and two of which were also in violation of the Labor Management Relations Act of 1947, damaging Benedict in excess of the amount sought by the Trustees. Benedict also defended upon the ground that even if the International Union had not been responsible for the strikes, the misconduct of Benedict's individual employees constituted a defense to the Trustees' action, because these employees were beneficiaries of the Trust.
 
 
 4
 In addition to its answer filed in response to the Trustees' complaint,[1] Benedict filed a cross-claim against the Unions, claiming damages resulting from the series of strikes between April, 1950, and May, 1953, allegedly caused or ratified by the Unions in violation of the aforesaid agreements and, in the case of two of these strikes, also allegedly in violation of the secondary boycott provisions of the Labor Management Relations Act of 1947. The cross-defendant Unions denied any violation on their part of either the agreements or the federal statute.
 
 
 5
 After a lengthy trial the issues were submitted to a jury, upon instructions that damages to Benedict caused by wrongful acts of its employees would constitute a defense to the Trustees' action, but that Benedict could recover on the cross-claim only upon a finding that wrongful acts of the individual employees had been caused or ratified by the Unions. The jury returned a verdict finding that the Trustees were entitled to recover unpaid royalties in the stipulated amount of $76,504.26, and that Benedict was entitled to a set-off against this amount of $81,017.68, the amount in which the jury found in the cross-claim that Benedict had been damaged by the Unions. In accordance with his interpretation of the jury's verdict the district judge entered judgment for Benedict against the Unions for $81,017.68 and granted execution of the same. He further entered judgment in favor of the Trustees against Benedict in the amount of $76,504.26, but instead of ordering execution upon this judgment, provided that it should be paid, under the administration of the court, from the proceeds of Benedict's judgment against the Unions.[2] From this judgment the Trustees have appealed, as have the Unions.
 
 
 6
 The issues presented by the appeals of the Unions will be dealt with first, since their determination affects the disposition of the Trustees' appeal. The many errors claimed by the Unions relate to three basic issues: (1) Did any or all of the strikes in question violate the agreement of 1950-52 or the Labor Management Relations Act if they were caused by the Unions? (2) If so, was there sufficient evidence to support a finding that either District 28 or the International Union was responsible for any or all of the strikes? (3) If so, were the damages assessed against the Unions excessive?
 
 
 7
 At the outset the Unions deny liability for damages resulting from the strikes on the ground that the right to strike was preserved in the 1950-52 agreement. It is true that the agreement expressly stated that the 'no strike' provisions of the previous contracts were superseded.[3] However, the agreement provided in detail the procedure to be followed for the settlement of localized disputes or grievances.[4] This procedure was also made exclusive and obligatory by the following provisions:
 
 
 8
 '3. The contracting parties agree that, as a part of the consideration of this contract, any and all disputes, stoppages, suspension of work and any and all claims, demands or actions growing thereform or involved therein shall be by the contracting parties settled and determined exclusively by the machinery provided in the 'Settlement of Local and District Disputes' section of this Agreement; or, if national in character, by the full use of free collective bargaining as heretofore known and practiced in the industry.
 
 
 9
 '4. The United Mine Workers of America and the Operators signatory hereto affirm their intention to maintain the integrity of this contract and to exercise their best efforts through available disciplinary measures to prevent stoppages of work by strike or lockout pending adjustment or adjudication of disputes and grievances in the manner provided in this agreement.'
 
 
 10
 These sections were revised in the 1952 amendment, but the obligation to resort to the specified procedure was not substantially changed.[5]
 
 
 11
 Determination of this preliminary issue thus depends upon what effect the agreement to settle all local disputes in accordance with the 'Settlement of Local and District Disputes' procedure had upon the right to strike which was expressly preserved in the 1950-52 agreement. The question is not without precedent. The same basic issue was thoroughly considered in United Construction Workers v. Haislip Baking Co., 4 Cir., 1955, 223 F.2d 872, 873; W. L. Mead, Inc., v. International Brotherhood of Teamsters, etc., D.C., 126 F.Supp. 466, affirmed 1 Cir., 1956, 230 F.2d 576; and International Union, United Mine Workers of America v. National Labor Relations Board, D.C.Cir., 257 F.2d 211. With all respect for the majority view expressed in the latter decision, we agree with the dissenting judge in that case, and with the decisions in the Haislip and Mead cases, that a strike to settle a dispute which a collective bargaining agreement provides shall be settled by an exclusive and obligatory alternative procedure constitutes a violation of the agreement.
 
 
 12
 This conclusion does not make meaningless the express abrogation of a no strike clause in the 1950-52 agreement. The right to strike was preserved with respect to all disputes not subject to settlement by other methods made exclusive by the agreement. Moreover, the Unions remained free from liability for spontaneous or 'wildcat' strikes. Such spontaneous strikes would be the kind of 'stoppages' and 'suspensions of work' which the agreement made subject to the settlement procedure therein provided.
 
 
 13
 Viewing the eleven work stoppages in question by these standards, and without stating the facts in detail, we conclude that the evidence was insufficient to show that the stoppage of September, 1950, the 'Water Strike' and the stoppage of January 10-11, 1951, the 'Collingsworth Strike,' were concerted strikes resulting from a labor dispute. These were clearly spontaneous work stoppages, and consequently, they did not constitute violations of the 1950-52 agreement. As to the remaining strikes, we conclude that, except for the 'Wage Stabilization Strike' of October, 1952, the evidence was sufficient to support the jury's determination that they resulted from localized labor disputes which were cognizable under the settlement procedure provided by the agreement.[6] The October, 1952, strike resulted from the refusal of the operators to pay negotiated wage increases in the absence of approval by the Wage Stabilization Board. Being national in scope, this dispute was not under the agreement subject to settlement on the local or district level.
 
 
 14
 The second basic contention of the International Union and District 28 is that even if the agreement prohibited strikes with respect to local disputes, the strikes in question were not authorized or ratified by the International Union or District 28. It is clear from the record that the district judge was not in error in instructing the jury that District 28 and its agents were agents of the International Union with respect to the activities involved here. The real issue is whether the District's agent did induce the strikes in question. The evidence on this issue was sparse and conflicting, but was sufficient to sustain the jury's finding. Scott, a former employee of Benedict and a member of the local mine committee, testified that prior to the first strike and several times thereafter he was told by Scroggs, a field representative of District 28, 'I can't tell you boys when to strike. I can't tell you to strike, but when I tell you when you don't get what you want why you boys know what to do.' Scott was then permitted to testify as to his understanding of Scroggs' statement. Scroggs unequivocally denied having made this statement. By their finding the jury chose to believe Scott rather than Scroggs. This was their prerogative.
 
 
 15
 The jury were properly instructed that the Unions were responsible for the acts of their representatives only if the latter were engaged within the scope of their employment or authority, but that actual authorization of specific acts was unnecessary. 29 U.S.C.A. 185(e). Moreover, the fact, if it is so, that field representatives of the District lacked actual authority to call strikes is not controlling. These representatives were sent by the District to attempt to settle local disputes at the Benedict mine. The declarations attributed to Scroggs all took place while he was on these missions. The calling of a strike was clearly one way to 'settle' a labor dispute, although a way not permitted by the agreement. Consequently the jury were amply justified in finding that Scroggs was acting within the scope of his employment when he made the declarations in question. Compare, United Mine Workers of America v. Patton, 4 Cir., 1954, 211 F.2d 742, 47 A.L.R.2d 850, with Garmeada Coal Co. v. International Union, D.C.E.D.Ky.1954, 122 F.Supp. 512, affirmed 6 Cir., 1956, 230 F.2d 945.
 
 
 16
 Finally, the Unions contend that even if liability for the strikes is imputable to them, the finding of damages in the amount of $81,017.68 was excessive and not supported by the evidence. For the reasons which follow we agree with this contention. Since the total verdict for Benedict was in the exact amount demanded in its cross-claim, the jury must have accepted each item of damage and attributed to it the respective amount claimed by Benedict.[7] Included in the items of loss claimed was $21,534.85, representing the amount expended on a construction project which was abandoned after construction was interrupted by strikes in February and April, 1952. We agree with the appellants that the district court erred in permitting the jury to consider this item as part of Benedict's damages. Benedict received materials and services for the entire $21,534.85. If Benedict subsequently decided to abandon the project and to write off the amount spent, it is difficult to see how the Unions thereupon became liable for the loss. Clearly this loss, if it be treated as such, is an item of special damages which could not have been within the contemplation of the parties to the contract. Compare United Construction Workers v. Haislip Baking Co., supra, 223 F.2d at pages 875-876.
 
 
 17
 We reach a similar conclusion with regard to the loss in the amount of $6,000 representing the replacement cost of a cable which had been purchased for use in the same construction project. After abandonment of the project the cable was left on the ground and about six months later was destroyed by a forest fire. Benedict's witness testified that the cable was not removed because it was anticipated that the construction would be resumed. Thus the loss of the cable was the direct result of Benedict's own decision, rather than the appellants' breach of contract. Moreover, the loss is so indirectly related to the strikes that it was clearly beyond the contemplation of the parties to the agreement.
 
 
 18
 In addition, we agree with the Unions' contention that the formula used by Benedict to calculate the amount of loss attributable to each strike, and apparently accepted by the jury, was clearly erroneous. The formula as it appears from the exhibits and testimony involved a determination of the amount by which the cost of coal produced during months in which strikes occurred was increased because of the curtailment of production and a resulting higher ratio of fixed costs to tons of coal produced. The increase in fixed costs per ton was multiplied by the number of tons which would have been produced during the month if no interruption had occurred, and the resulting amount was claimed as the loss sustained because of the strike. This formula was erroneous because it measured only increased costs rather than actual profit or loss. Benedict's own records indicated that even if production had been uninterrupted and all coal sold at the price actually received each month, a substantial loss would nevertheless have been sustained. Only to the extent that the loss was aggravated by the strikes is Benedict entitled to recovery from the Unions. Upon the present record, even if Benedict's figures are accepted as the basis for the computation, the eight strikes which could properly have been found to be in violation of the contract could have increased Benedict's actual losses by not more than $15,866.54.[8]
 
 
 19
 Because of these errors affecting the amount of damages Benedict was entitled to recover from the Unions, the judgment must be set aside and the case remanded for a new trial upon that issue. By reason of what we have said on this review it is possible that additional or different evidence may be introduced upon the issue of damages at a retrial. Accordingly, nothing that has been stated here should be understood as fixing a maximum allowable recovery in a second trial.
 
 
 20
 We turn now to the separate issues raised by the Trustees' appeal. The jury found that Benedict was liable to the Trustees for unpaid royalties in the amount of $76,504.26. Determining, however, that a set-off of $81,017.68 was intended, the district court ordered that the Trustees should recover only after Benedict's judgment against the Unions was paid. Accordingly, Benedict was granted execution of its judgment with instructions that the sum be paid into the registry of the court. From this sum the Trustees were to receive $76,504.26 and the balance was to go to Benedict. Because the Trustees' judgment was conditional, neither execution nor interest was granted. It is the Trustees' contention that this disposition was erroneous and that they are entitled to an unconditional judgment with interest for the $76,504.26 representing unpaid royalties.
 
 
 21
 The heart of the Trustees' appeal lies in their contention that it was error for the district court of construe the 1950-52 agreement as making the Trustees third party beneficiaries of Benedict's promises. If the district court was correct, then defenses available against the unions were also available to Benedict as set-offs against the Trustees. In addition to permitting Benedict to set off damages resulting from breaches attributable to the Unions, the district court held that acts of individual employees of Benedict which caused damage to Benedict could be the basis for set-offs against the Trustees, even if the acts were not imputable to the Unions.
 
 
 22
 The Trustees assert that under the 1950-52 contract, title to the royalties passed to the Trustees immediately upon production of the coal. Consequently they argue that their cause of action was one to recover property held in constructive trust for them by the settlor, Benedict. If correct in these contentions, the Trustees would be immune from set-offs or claims which Benedict might have against the Unions or the individual employees.
 
 
 23
 The provision of the agreement specifically relied upon by the Trustees states: 'Title to all moneys paid into and or due and owing said Fund shall be vested in and remain exclusively in the Trustees of the Fund, and it is the intention of the parties hereto that said Fund shall constitute an irrevocable trust. * * *' Acceptance of the Trustees' interpretation would require the conclusion that the parties intended that the royalties become 'due and owing' as soon as the coal left the ground. To thus construe the royalty provisions as being independent of the obligations assumed by the Unions would, however, be inconsistent with the agreement considered as an entirety. The 1950-52 agreement specifically provided: 'This Agreement is an integrated instrument and its respective provisions are interdependent. * * *' Further, the provision requiring that the parties resort to the specified procedure for the settlement of local disputes is stated to be 'part of the consideration of this contract.' Hence we conclude that the obligation to make payments to the Trustees was dependent upon performance by the Unions of their obligations, and consequently that the district court was correct in ruling that the Trustees were third party beneficiaries of the contract and subject to the defenses arising from breaches by the Unions.
 
 
 24
 We cannot agree, however, that Benedict was entitled to a set-off against the Trustees for losses resulting from acts committed by individual employees not imputable to District 28 or the International Union. The individual employees were not parties to the agreement, so their acts clearly could not amount to a breach unless the acts were imputable to a contracting party. Benedict's contention, which was accepted by the district court, was that the individual members were beneficiaries of the Fund and that since the royalty payments were for their ultimate benefit, their misconduct would pro tanto relieve benedict of the obligation to make the royalty payments.
 
 
 25
 This theory overlooks the nature of the Fund and its relationship to the individual employees. Though sui generis, union welfare funds created under the authority of 29 U.S.C.A. 186(c), are similar in some respects to charitable trusts. See Van Horn v. Lewis, D.C. 1948, 79 F.Supp. 541, 545; Cf. Hobbs v. Lewis, D.C.1958, 159 F.Supp. 282. As in a true charitable trust, the actual beneficiaries of this fund are not ascertainable. Present employees who are potential beneficiaries may have an 'interest' sufficient to enforce compliance with statutory requirements for administration of the fund, see Wilkens v. De Koning, D.C.E.D.N.Y.1957, 152 F.Supp. 306, but it is clear that the agreement did not contemplate vesting the employees with a present 'interest' in the trust res so as to warrant a set-off in favor of the settlor.
 
 
 26
 This was made clear by the agreement, which provided that 'no benefits or moneys payable from this fund shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void. The moneys to be paid into said fund shall not constitute or be deemed wages due to the individual mine worker, nor shall said moneys in any manner be liable for or subject to the debts, contracts, liabilities, or torts of the parties entitled to such money; i.e., the beneficiaries of said Trust under the terms of this Agreement'. These restrictions upon dispersal of the trust funds were applicable whether the party seeking to assert a claim was a third party or the settlor.
 
 
 27
 The Trustees, however, were not prejudiced by the error of the district court on this phase of the case. On the cross-claim the jury found that all of the acts in question were in fact caused or ratified by the Unions. The jury's finding on the set-off must also, therefore, have been on the basis of acts attributable to the Unions rather than to unauthorized conduct of individual employees.
 
 
 28
 Since the Trustees were properly determined to be third party beneficiaries and subject to defenses arising from breaches by the Unions, the district court correctly concluded that the judgment for the Trustees, to the extent that it was subject to a set-off, was conditional and not entitled to execution and interest. However, it is evident for the reasons discussed earlier that the losses for which Benedict may be compensated will be less than the amount of the Trustees' judgment, and the Trustees will be entitled to interest and execution on that part of the judgment in their favor which is in excess of the allowable set-off.
 
 
 29
 The judgments are set aside. Case No. 13,056 is remanded solely for a redetermination, in accordance with the views expressed in this opinion, of the amount of damages Benedict is entitled to recover from the Unions. The judgment in favor of the Trustees will then be amended by the district court to allow execution and interest on that part of the said judgment which is in excess of the set-off in favor of Benedict as so redetermined.
 
 
 30
 Nos. 13,055-56
(1) An increase in the cost
 of production of coal
 mined during each of
 the eleven months in
 which strikes occurred,
 aggregating .............. $49,850.33
(2) Loss resulting from the
 abandonment of a
 construction project ...... 21,534.85
(3) Loss resulting from the
 destruction of a cable
 by forest fire ............. 6,000.00
(4) Loss of income incurred
 because of inability to
 process coal for other
 procedures during the
 strikes .................... 3,632.50
 ----------
 Total ................ $81,017.68
 
 
 31
 Average
 Actual sales
 cost price Actual
 Actual per per Actual Actual loss
 Date tonnage ton ton sales Costs or gain
Apr --50 20,468.5 $6.397 $5.608 $114,785.31 $130,936.92 $-16,151.61
Jul --51 11,828 5.264 5.563 65,803.37 62,259.35 k 3,544.02
Oct --51 13,508.5 6.110 5.705 77,067.94 82,532.43 - 5,464.49
Nov --51 14,271.4 5.729 5.798 82,745.85 81,754.47 k 991.38
Feb --52 16,033.6 6.130 5.492 88,064.28 98,283.03 -10,218.75
Apr --52 16,631.4 6.083 5.370 89,317.55 101,164.67 -11,847.12
Aug --52 8,460 5.907 5.315 44,962.39 49,972.94 - 5,010.55
May --53 6,114.4 7.503 5.557 33,975.53 45,879.66 -11,904.13
 -----------
 Net Actual Loss ........... $ 56,061.25
 Average
 Projected sales
 cost per price Projected
 Projected ton per Projected Projected loss or
 Date tonnage ton sales costs gain
Apr --50 23,044 $6.24 $5.608 $129,230.75 $143,794.56 $-14,563.81
Jul --51 13,516 5.142 5.563 75,189.51 69,499.27 k 5,690.24
Oct --51 18,272 5.746 5.705 104,241.76 104,990.91 - 749.15
Nov --51 16,053 5.507 5.798 93,075.29 88,403.87 k 4,671.42
Feb --52 17,635 6.008 5.492 96,851.42 105,951.08 - 9,099.66
Apr --52 18,647 5.954 5.370 100,234.39 111,024.24 -10,789.85
Aug --52 9,668 5.721 5.315 51,385.42 55,310.63 - 3,925.21
May --53 10,186 6.679 5.557 56,603.60 68,032.29 -11,428.69
 -----------
 Increase in Loss.......$15,866.54 Net Projected loss..... $ 40,194.71
 
 
 32
 MILLER, Circuit Judge (concurring in part and dissenting in part).
 
 
 33
 I concur in the rulings of the majority opinion, except with respect to some of them involving the question of damages.
 
 
 34
 The majority opinion holds that, as a matter of law, liability for damages on the part of the unions could exist only in eight of the eleven work stoppages in issue, and that it was error to permit the jury to include in its verdict damages alleged to have been caused by the remaining three work stoppages, referred to in the record as the 'Water Strike,' the 'Collingsworth Strike,' and the 'Wage Stabilization Board Strike.' I am of the opinion that it was proper for the jury to consider what damage, if any, was caused by each one of the eleven work stoppages, instead of only eight.
 
 
 35
 With respect to the 'Water Strike' and the 'Collingsworth Strike' the majority ruling is that they were spontaneous work stoppages, rather than concerted strikes resulting from a labor dispute, and consequently did not constitute violations of the 1950-52 Agreement. There was evidence that Field Representative Scroggs of District 28 told members of the local, 'Boys, I can't tell you. * * * I can't tell you boys when to strike. I can't come out and tell you to strike, but when I tell you when you don't get what you want way you boys know what to do then,' and that this was understood by those who knew the language to mean, 'Well, we knowed, when he told us that we knowed to strike.' Section 4 of the 1950 agreement provided that the United Mine Workers would exercise their best efforts through available disciplinary measures to prevent stoppages of work by strike pending adjustment of grievances in the manner provided by the agreement. There were two or three strikes over water without disciplinary action being taken by the unions. There was evidence that Scroggs supported the position of the strikers in the 'Collingsworth Strike.' In my opinion, this evidence was sufficient to take to the jury the factual issue of whether these strikes were of the 'wildcat' type for which the unions were not responsible or were work stoppages either instigated or ratified by the union representatives in violation of the Agreement.
 
 
 36
 With respect to the 'Wage Stabilization Board Strike' in October, 1952, it is true that the issue involved was national in scope and under the Agreement was not required to be settled by the machinery provided in the 'Settlement of Local and District Disputes' section. But the amended agreement, effective October 1, 1952, also provided: 'The United Mines Workers of America and the Operators agree and affirm that they will maintain the integrity of this contract' and that in the case of disputes national in character 'the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry,' it being the purpose of this provision to settle such disputes by collective bargaining without recourse to the courts. The 1952 amendment provided for a per diem increase for the mine workers at $1.90 a day. On October 18, 1952, the Wage Stabilization Board refused to approve more than $1.50 of this increase. Miners throughout the country went on strike, including miners of Benedict. Under date of October 21, 1952, the President of the United Mine Workers replied to a letter received from the President of the National Bituminous Coal Operators Association, in which he wrote in part as follows: 'You assert that many miners are not working. You also know that they are outraged by the attempt of the N A M ruffians to filch milk money from their purse. They are acting as individuals. They are exercising their rights as individuals and freeborn Americans. They have not sought nor been given advice or suggestions by their Union or this writer. We have a contract. We expect your compliance with its provisions. Miners will work when you honor its provisions. If you do not like the contemptible action of the N A M labor baiters and the little Harvard professor and his quavering trio, appeal and ask for review and reversal. You are the sole petitioner and plaintiff.' I do not believe that this Court can say as a matter of law that this action of the Union was not a violation of its contract obligation to 'settle such disputes by free collective bargaining as heretofore practiced in the industry.' The statutory concept of free collective bargaining is 'the mutual obligation of the employer and the representatives of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, * * *.' Sect. 158(d), Title 29 U.S.C.A.; N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 409, 72 S.Ct. 824, 96 L.Ed. 1027. Good faith requires an unpretending, sincere intention and effort to arrive at an agreement; it is a state of mind which can be resolved only through an application of the facts in each particular case. N.L.R.B. v. Stanislaus Implement & Hardware Co., 9 Cir., 226 F.2d 377, 380. The Union's action in this instance could reasonably be construed as an approval of the action of the miners together with a recommendation to them that the strike continue irrespective of its purpose to compel Benedict to pay wages which would have been a violation of law on its part to pay. Although a labor union has the general right to strike for the advancement of its own economic interests, Section 163, Title 29 U.S.C.A., such right does not include the right to strike to accomplish an unlawful purpose or to force an employer to act in violation of the laws or established policies of the United States Government. United States v. Chattanooga Chapter, etc., D.C.E.D.Tenn., 116 F.Supp. 509, 511; N.L.R.B. v. Aladdin Industries, 7 Cir., 125 F.2d 377, 380-381, certiorari denied 316 U.S. 706, 62 S.Ct. 1310, 86 L.Ed. 1773; N.L.R.B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 256, 59 S.Ct. 490, 86 L.Ed. 627. Whether the action of the Union complied with its contract obligation to 'maintain the integrity of this contract' and constituted a good-faith exercise of 'free collective bargaining,' as also required by its contract, is a question which in my opinion should be decided by the jury, rather than by this Court. Allied Equipment Co. v. Weber Engineered Products, 4 Cir., 237 F.2d 879, 883.
 
 
 37
 I concur in the ruling of the majority opinion that it was error to permit the jury to consider the claimed loss of $6,000 representing the replacement cost of a cable which was destroyed by a forest fire, but I am not in accord with its holding on the question of the amount of damages caused by the other work stoppages considered by it.
 
 
 38
 With respect to the claimed loss of $21,534.85 resulting from the abandonment of a construction project, the evidence was that that amount was the cost of the labor and material which went into the incompleted project. The majority opinion, in rejecting this item of damage as a matter of law, treats the abandonment of the project as a voluntary act on the part of Benedict, holding that Benedict was not damaged in that it received materials and services for the entire $21,534.85 which it expended. Such rule is not applicable, however, if the abandonment of the project was not a voluntary act on the part of Benedict. Harris v. The Cecil N. Bean, 2 Cir., 197 F.2d 919, 921-922; Restatement, Contracts, Sect. 357(1)(a). If the unions were responsible for the abandonment of the project, Benedict would not be chargeable with the cost of the materials and services which went into the project, but rather only with the amount of the benefit which it received from such materials and services. Morton v. Roanoke City Mills, Inc., 4 Cir., 15 F.2d 545, 547; In re Irving-Austin Bldg. Corporation, 7 Cir., 100 F.2d 574, 578; Schwasnick v. Blandin, 2 Cir., 65 F.2d 354, 357; Restatement, Contracts, Sect. 357(3). Whether the abandonment of the project was voluntary on the part of Beneict was a factual issue in the case. There was substantial evidence on the part of Benedict that the labor trouble and pressure became so great the contractor was forced to quit, which in my opinion was sufficient to take such factual issue to the jury. There was also evidence that Benedict did not get a dollar's worth of use out of the work, that the work had not progressed to the point where it could have been used for anything, and that the investment was a complete loss. What benefit, if any, Benedict received from the partial performance of the contract, likewise seems to be a jury question.
 
 
 39
 With respect to other work stoppages, Benedict introduced evidence showing the difference between the cost per ton of the coal actually mined and the decreased cost per ton if production had not been suspended by the strikes. This increase in fixed costs per ton was multiplied by the number of tons which would have been produced during the month if production had not been suspended during the strikes, and the resulting amount claimed as the loss sustained because of the strike. I agree with the majority ruling that this formula did not correctly show the damage. It included the increased cost of production on tonnage that was not mined. With respect to tonnage that was not mined, Benedict's damage was the loss of profits which would have resulted if such tonnage had been produced and sold. Increased cost of production is only one element affecting profits. United States v. Griffith, Gornall & Carman, Inc., 10 Cir., 210 F.2d 11, 14. It was not shown that this tonnage, if produced, would have been sold at a profit. It is contended that it would have been sold at a loss if it had been mined, in which event Benedict was not damaged. With respect to the tonnage that was not mined, the question of what damage, if any, was sustained by Benedict by reason thereof, should have been submitted to the jury under instructions applicable to lost profits. Yates v. Whyel Coke Co., 6 Cir., 221 F. 603, 607; Roseland v. Phister Mfg. Co., 7 Cir., 125 F.2d 417, 420, 139 A.L.R. 1013. See: Union Cotton Co. v. Bondurant, 188 Ky. 319, 323-324, 222 S.W. 66.
 
 
 40
 With respect to the coal that was mined by Benedict, Benedict's damage was the amount by which its profits were reduced by the strike, or if the coal was produced at a loss, the amount by which the loss was aggravated by the strike. Increased cost of production caused by the strike was a proper element for the consideration of the jury.
 
 
 
 [1]
 Benedict also filed a counterclaim against the Trustees for the recovery of royalties it had actually paid during the period involved. The counterclaim was denied by the district court in a summary judgment, from which Benedict has not appealed
 
 
 [2]
 'In accordance with the Court's interpretation of the offset provision in the jury's verdict and as a means of carrying out the intended effect of the verdict, it is ordered that the Benedict Coal Corporation have and recover the sum of $81,017.68 from United Mine Workers of America and United Mine Workers of America District 28, for which execution may issue
 'It is further ordered that said sum of $81,017.68 be paid into the registry of the Court to be disbursed by the clerk in accordance with instructions appearing below.
 'It is further ordered that said Trustees, in accordance with the verdict rendered in their favor, have and recover of Benedict Coal Corporation the sum of $76,504.26, said recovery to be had in the manner following: From the aforesaid $81,017.68 ordered paid into the registry of the Court, that the sum of $76,504.26 be paid to said Trustees. That the difference between $76,504.26 and $81,017.68 be paid to Benedict Coal Corporation.'
 
 
 [3]
 '1. Any and all provisions in either the Appalachian Joint Wage Agreement of June 19, 1941, or the National Bituminous Coal Wage Agreement of April 11, 1945, containing any 'no strike' or 'Penalty' clause or clauses or any clause denominated Illegal Suspension of Work' are hereby rescinded, cancelled, abrogated and made null and void.'
 
 
 [4]
 'Settlement of Local and District Disputes
 'Should differences arise between the Mine Workers and the Operators as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences immediately:
 '1. Between the aggrieved party and the mine management.
 '2. Through the management of the mine and the Mine Committee.
 '3. Through District representatives of the United Mine Workers of America and a commissioner representative (where employed) of the coal company.
 '4. By a board consisting of four members, two of whom shall be designated by the Mine Workers and two by the Operators.
 '5. Should the board fail to agree the matter shall, within thirty (30) days after decision by the board, be referred to an umpire to be mutually agreed upon by the Operator or Operators affected and by the duly designated representatives of the United Mine Workers of America, and the umpire so agreed upon shall expeditiously and without delay decide said case. The decision of the umpire shall be final. Expenses and salary incident to the services of an umpire shall be paid equally by the Operator or Operators affected and by the Mine Workers.
 'A decision reached at any stage of the proceedings above outlined shall be binding on both parties hereto and shall not be subject to reopening by any other party or branch of either association except by mutual agreement.'
 
 
 [5]
 '3. The United Mine Workers of America and the Operators agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Local and District Disputes' section of this Agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract provided and by collective bargaining without recourse to the courts.'
 
 
 [6]
 This being so, it is unnecessary to consider whether two of these strikes also violated the Labor Management Relations Act of 1947
 
 
 [7]
 The damages alleged by Benedict consisted of the following items:
 
 
 [8]