**BUCKEYE POWER, INC., and Trumbull Corporation, Plaintiffs-Appellants,**

v.

**UTILITY WORKERS UNION OF AMERICA et al., Defendants-Appellees.**

No. 77–3286.

United States Court of Appeals, Sixth Circuit.

Argued June 18, 1979.

Decided Oct. 16, 1979.

Edward F. Whipps, George, Greek, King, McMahon & McConnaughey, Columbus, Ohio, for Buckeye Power, Inc.

James Brooker, Day, Ketterer, Riley, Wright & Rybolt, Canton, Ohio, for Trumbull Corp.

Donald Menagh, Menagh, Trainor & Rothfeld, Norman Rothfeld, New York City, Stewart R. Jaffy, Clayman, Jaffy & Taylor, Columbus, Ohio, for Utility Workers Union.

Eugene Green, Green, Schiavoni, Murphy & Haines, Youngstown, Ohio, for Local Nos. 468 & 492.

Adam E. Scurti, Steubenville, Ohio, David L. Robertson, Bogarad & Robertson, Weirton, W. Va., for Local No. 478.

Before EDWARDS, Chief Judge, KEITH, Circuit Judge, and BROWN,* District Judge.

EDWARDS, Chief Judge.

Plaintiffs Buckeye Power and Trumbull Corporation filed complaints against Local 478 of the Utility Workers Union of America, AFL–CIO (henceforth Local 478) and the Utility Workers of America, AFL–CIO (henceforth the National Union) claiming damages for violation of the secondary boycott prohibition contained in § 8(b)(4)(i), (ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i), (ii)(B) (1976). The case was tried before District Judge Robert Duncan in the Southern District of Ohio without a jury. Judge Duncan entered findings of facts as to both the defendants, holding that Local 478 was liable for damages to plaintiffs, and that the National Union was not. Defendant Local 478 did not appeal. Plaintiffs-appellants have appealed the no liability holding against the National Union.

The District Judge found the relevant facts as follows:

*Facts*

The dispute herein centers around the construction of an electric generating plant for Buckeye Power Company. Construction of this plant, commonly known as Unit No. 3, was begun in 1972 at a point adjacent to two already functioning generating units, one owned by plaintiff Buckeye and the other by Ohio Power Company, a sister power company. After construction of these first two units (Units No. 1 and No. 2), Buckeye and Ohio Power formed a separate company, Cardinal Operating, to operate the power plants; each of the forming companies owns one-half of the capital stock and each elects one-half of its board of directors. It is anticipated that, upon completion of Unit No. 3, it, too, will be operated by Cardinal.

Local Union No. 478 of the Utility Workers of America (hereinafter "Local 478") is the bargaining representative for Cardinal's production and maintenance employees who operate Units No. 1 and No. 2. It is also an affiliate of the Utility Workers of America (hereinafter referred to as the "National Union"). On May 31, 1973, the collective bargaining agreement between Local 478 and Cardinal Operating Company expired. Negotiations for a new contract were begun; meanwhile, members of Local 478 continued to work. On June 19, 1973, however, apparently dissatisfied that no new agreement had been reached, members of Local 478 went out on strike. The legality of this strike is not at issue between the parties. What is in dispute is the legality of Local 478's picketing activity at several gates to the Cardinal complex, the area in which Units 1 and 2 are located and in which Unit No. 3 is being built.

There are six entrances to this Cardinal complex. Gate 1 was, during the relevant time period, an entrance to the Cardinal Operating plant; . . .

* Honorable Bailey Brown, Chief United States District Judge for the Western District of Tennessee, sitting by designation.

Prior to March 20, 1973, Gate 3 had been used as an entrance for employees of the Cardinal operating facilities. On that date, Cardinal through its manager, Mr. Clarence Archer, effected a change in gate use: . . .

After the March 20, 1973, change of gate usage, there was no more than *de minimis* use of Gate 3 by members of Local 478. . . .

The evidence does establish that Gate 3 after March 20, 1973, was reserved for and used by personnel involved in the construction of Unit 3.

The second gate at issue between the parties is Gate 6.

.    .    .    .    .

There was no evidence that this gate was used for any other purpose other than hauling by Trumbull employees.

On June 19, when members of Local 478 walked off the job at Cardinal Operating Company, barriers were erected at Gates 1, 3, 5 and 6, blocking access through these gates. As noted above, this Court is not concerned with the activity at Gates 1 and 5, but only that at Gates 3 and 6. With regard to these latter two gates, cars and other material were used to block the gate entrance and men milled around each gate carrying or posting signs stating "478 on strike." As a result of the picketing, employees of the independent contractors refused to perform work on the premises. . . . The evidence shows, however, that members of Local 478 did more than watch; they barred access to the gate, establishing a picket line which employees of Trumbull Corporation recognized and respected as such. . . .

The evidence shows and I so find that Local 478 was picketing both Gates 3 and 6 beginning June 20 and continuing until approximately July 5, 1973.[2]

[2] Picketing activity at the various gates ceased on different dates. For example, picketing at Gate 6 ended by June 26 although picketing activity did not cease at Gate 3 until approximately July 5.

Also present at the Cardinal site in addition to members of Local 478 was a representative of the National Union. Mr. Edward Coggins, Director of Region III of the National Union and a member of its Executive Board, was involved in the ongoing negotiating sessions for a new contract, acting as chief spokesman for the utility workers. According to Mr. Coggins' testimony he was present at the Cardinal site on the day of the strike to investigate the situation there and to help ensure that sister unions of Local 478 did not walk off their jobs also. Mr. Coggins stated that he was not actually aware that members of Local 478 were picketing construction gates and thus, as a representative of the National Union, he could not have condoned or acquiesced in the alleged illegal picketing. Leaving aside for a moment the question of the National Union's complicity in the picketing of Gates 3 and 6, the evidence taken as a whole supports the conclusion that Mr. Coggins was aware that members of Local 478 were barring access through Gates 3 and 6 to the Cardinal construction site. Lynn Patterson talked to Mr. Coggins about the various activities of his men. Coggins was informed that Local 478 was monitoring Gates 3 and 6; he had previously testified that no distinction was made in his discussions with Patterson between picketing and monitoring.

When asked by Mr. Patterson for his opinion regarding the legality of picketing construction gates, Coggins did tell Local 478 that construction gates were not to be picketed. Apart from these cautionary words, Coggins took no other action to attempt to stop the picketing of Gates 3 and 6.

We have reviewed this record and find no basis for holding that any of the District Judge's careful findings of facts are "clearly erroneous." *See* Fed.R.Civ.P. 52(a).

### THE LAW OF THIS CASE

Our holding that the District Judge's findings of fact are not clearly erroneous does not end our consideration of this appeal. Essentially the District Judge found

that Local 478's actions occasioned the secondary boycott and that there was no proof that the National Union's actions "instigated or encouraged the picketing of the construction gates."

Appellants' position is summarized in its brief in two critical paragraphs. Its first legal position is:

> The principles of law which control this situation are set forth in *Vulcan Materials Co. v. United Steelworkers of America*, 430 F.2d 446 (5th Cir. 1970), *cert. den.* 401 U.S. 963 [, 91 S.Ct. 974, 28 L.Ed.2d 247] (1971) and *Local Union 984, Int. Bros. of Teamsters v. Humko*, 287 F.2d 231 (6th Cir. 1961), *cert. den.* 366 U.S. 962 [81 S.Ct. 1922, 6 L.Ed.2d 1254] (1961). Those cases recognize that a national union participating with its striking local in labor negotiations is liable as a principal actor for illegal secondary activity engaged in by the local in connection with the strike *if the national encourages, acquiesces in or condones the picketing.* The national union becomes responsible not only for the conduct of its own agents but also for the conduct of the agents of the local because the national and local are acting in concert. (Emphasis added.)

Its last statement of the law is:

> Whether or not Coggins cautioned against the picketing, it is clear that he, and the National through him, *failed to take affirmative action designed to end the picketing.* Instead, an election was made to take no action and accept the benefits of Local 478's secondary boycott for bargaining purposes. *By its inaction,* the National acquiesced in and condoned the illegal picketing, and therefore, it is liable as a principal actor for the damages caused Buckeye and Trumbull. (Emphasis added.)

The District Judge did not find the nearly unlimited powers vested in the National Union which appellants contend exist. He said:

> Preliminarily, it is perhaps fair to state that the National Union is not as all-powerful as plaintiffs contend nor as weak and ineffective as defendants would have the Court believe. The Constitution of the National Union gives it certain delimited powers over local unions including the requirement of official sanction by the National office before a local union calls a strike. Art. IX, Section 1. It further provides for suspension of a local union or a member thereof for failure to comply with constitutional provisions. Art. VIII, Section 1. While I believe that these and other similar provisions of the national constitution give the National Union the power and obligation to take action in certain circumstances, they do not of themselves define the action which in any particular case the National Union can reasonably be expected to take. This determination must always be done on a case-by-case basis.

The District Court also concluded that the National Union had taken no "positive actions" which violated § 8(b)(4)(i), (ii)(B):

> In the instant case Mr. Coggins, the representative of the national union, was apparently only at the scene of the strike on June 20, 1973, the first day of the walkout. Thereafter, he appears to have been elsewhere involved in contract negotiations. There is certainly no evidence that he or any other representative of the National Union took any positive actions which instigated or encouraged the picketing of the construction gates. The only evidence regarding Mr. Coggins' involvement was his counsel to Mr. Patterson that picketing of construction gates was prohibited.

As the District Judge recognized, the statute upon which this action is based does not contain language making "inaction" the equivalent of inducing, acquiescing in, or encouraging a secondary boycott absent an element of control of the situation which the District Judge found to be missing here:

> (b) It shall be an unfair labor practice for a labor organization or its agents—
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in

an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

29 U.S.C. § 158(b)(4)(i), (ii)(B) (1976).

The *Riverton* case (*Riverton Coal Co. v. UMW*, 453 F.2d 1035 (6th Cir.), *cert. denied*, 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972)), illustrates this distinction. There, in an employer's suit for breach of contract, the United Mine Workers national union was the signatory party. It had a duty to fulfill its contract and this court found that it had the full power needed to perform that duty:

Local 1209 was not an autonomous labor organization separate and apart from UMW. It was an administrative arm of UMW and was supervised, dominated and controlled by UMW. Under the UMW constitution, UMW had the right "to reverse the action of the Local Union."

It can well be said that UMW, having the power to correct the unlawful action of the Local union, and deciding to accept the benefit of it instead of taking appropriate action to halt the strike as it was required to do under the contract, thereby induced and encouraged both the 1964 and the 1966 strike. *Local Union 984, International Bhd. of Teamsters, etc. v. Humko Co.*, 287 F.2d 231 (6th Cir.), cert. denied, 366 U.S. 962, 81 S.Ct. 1922, 6 L.Ed.2d 1254 (1961).

*Id.*, at 1042.

In the *Humko* case (*Local 984, International Brotherhood of Teamsters v. Humko Co.*, 287 F.2d 231 (6th Cir.), *cert. denied*, 366 U.S. 962, 81 S.Ct. 1922, 61 L.Ed.2d 1254 (1961)), the District Judge there found elements of actual involvement and control which are plainly missing in our instant case. In *Humko* the International Union was a party to the calling of the strike. The strikers were told that the International was "100% behind the strike." *Id.* at 238. The trial court found that the International:

by instructing and directing the pickets at the situs of the secondary employer, had knowledge of, participated in and ratified the acts and conduct of its Local 984;

*Id.* at 237.

Similar differences in facts serve to distinguish *Vulcan Materials Co. v. United Steelworkers of America*, 430 F.2d 446 (5th Cir. 1970), *cert. denied*, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971), from our present case.

In contrast, this court has also affirmed a finding that the International Union was not liable for illegal conduct of one of its local unions where, as here, the plaintiff's complaint centered upon the International's inaction. *Harnischfeger Corp. v. Sheet Metal Workers, Int.*, 436 F.2d 351 (1970). The court there said:

The only cause for action available to Harnischfeger derives from § 303 of the Labor Management Relations Act, and the District Court correctly applied ordinary agency standards in determining, whether the International Union should be held responsible for the picketing.

*Riverside Coal Company, Inc. v. United Mine Workers,* 410 F.2d 267, 270 (6th Cir. 1969) cert. denied, 396 U.S. 846, 90 S.Ct. 89, 24 L.Ed.2d 95 (1969); *Ritchie v. United Mine Workers, supra,* 410 F.2d 827 at 833 (6th Cir.). We also observe that the Court was cognizant of our decision in *Local Union 984 v. Humko Co.,* 287 F.2d 231, 241–242 (6th Cir. 1961), cert. denied, 366 U.S. 962, 81 S.Ct. 1922, 6 L.Ed.2d 1254 (1961), in which we relied in part upon the provisions of the international union's constitution in finding that the international participated as a "principal actor" in the secondary boycott there in question.

The court below properly considered the constitution of appellee International Union and heard testimony regarding its interpretation and application.

*Id.* at 355.

*Harnischfeger* supports the District Judge's decision in this case to treat the interpretation and application of a national union's constitution to the facts in a particular strike situation as, posing essentially questions of fact. *Id.* at 356.

We decline appellants' invitation to disregard the District Judge's findings of facts and, as a matter of law, treat the National Union as an active partner in this boycott.

This court has previously (in a quite different factual context) expressed concern about invoking vicarious liability in labor-management affairs:

> It has been clear to Congress for many years that imposition upon unions of vicarious liability for the unauthorized acts of individuals could easily mean the elimination of labor unions as a social institution in America. The clearest expression of Congressional concern is, of course, in the Norris-LaGuardia Act and, specifically, in Section 6 thereof.[2]

[2] "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge

thereof." Norris-LaGuardia Act, 29 U.S.C. § 106 (1970).

Irresponsible or violent acts by individual workers (or by agents provocateur) if automatically attributable to the union on the scene could, of course, serve to destroy it. But such vicarious liability is repugnant to due process of law. And this circuit has repeatedly recognized that unions may only be held responsible for the authorized or ratified actions of its officers and agents. *See Blue Diamond Coal Co. v. United Mine Workers of America,* 436 F.2d 551 (6th Cir. 1970), cert. denied, 402 U.S. 930, 91 S.Ct. 1525, 28 L.Ed.2d 863 (1971); *Lewis v. Benedict Coal Corp.,* 259 F.2d 346 (6th Cir. 1958), aff'd by an equally divided Court, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960); *Garmeada Coal Co. v. International Union, United Mine Workers of America,* 230 F.2d 945 (6th Cir. 1956).

*North American Coal Corp. v. Local 2262, UMW,* 497 F.2d 459, 466–67 (6th Cir. 1974). (Footnote 3 omitted).

The judgment of the District Court is affirmed.