KERRY COAL COMPANY, Plaintiff,

v.

UNITED MINE WORKERS OF AMERICA, District No. 5 of the United Mine Workers of America, Jerry Ashton, Estel Taylor, James Beachem, Brian Short, John Doe, Richard Roe, and all others acting in concert with them or otherwise participating with them or acting on their behalf, Defendants.

Civ. A. No. 78–108.

United States District Court,
W. D. Pennsylvania.

March 25, 1980.

---

John M. Elliott and William Miller, Dilworth, Paxson, Kalish, Levy & Coleman, Philadelphia, Pa., for plaintiff.

Lloyd F. Engle, Jr., and Paul M. Puskar, Kuhn, Engle & Stein, Pittsburgh, Pa., for United Mine Workers, Dist. No. 5 and Taylor.

Melvin Vatz, Pittsburgh, Pa., for Ashton, Beachem and Short.

## OPINION

SNYDER, District Judge.

This matter is before the Court on the Defendants' Motions for Judgment Notwithstanding the Verdict and for New Trial. The Motions will be denied.

### I. *The Procedural Background*

Kerry Coal Company ("Kerry Coal") brought suit against the United Mine Workers of America ("International"), District No. 5 of the United Mine Workers of America ("District"), Estel Taylor, District No. 5 Board Member, James Beachem, Brian Short and Jerry (Gary) Ashton, Members of the United Mine Workers, and the matter was tried to a jury on three counts of a six count complaint. The jury answered special interrogatories[1] and awarded the

---

1. The Special Interrogatories and Answers thereto were:

#### COUNT I
##### A. *AS TO THE EMPLOYEES*

1. Did the United Mine Workers of America (International) induce or encourage one or more employees of the Kerry Coal Company, or of the trucking companies hauling for Kerry Coal Company, or of the Railroad, to refuse to process, transport or handle Kerry coal?

Answer <u>Yes</u>

2. Was an object of the aforementioned conduct by the International to require or force the employer, Kerry Coal Company, to cease doing business, or the trucking companies hauling Kerry coal, or the Railroad to cease processing, transporting, or handling Kerry coal?

Answer <u>Yes</u>

3. Were the actions of the International a proximate cause of damage to the Kerry Coal Company?

Answer <u>Yes</u>

4. Did the United Mine Workers of America, District No. 5, induce or encourage one or more employees of the Kerry Coal Company, or of the trucking companies hauling for Kerry Coal Company, or of the Railroad, to refuse to process, transport, or handle Kerry coal?

Answer <u>Yes</u>

5. Was an object of the aforementioned conduct by District No. 5 to require or force the employer, Kerry Coal Company, to cease doing business, or the trucking companies hauling Kerry coal, or the Railroad to cease processing, transporting, or handling Kerry coal?

Answer <u>Yes</u>

Plaintiff compensatory damages in the amount of $1,200,000, against all Defendants except James Beachem.

Count I of the Complaint charged the International and the District with a violation of Section 8(b)(4) of the Labor Management Relations Act, 29 U.S.C. § 158(b)(4), which makes it unlawful for a labor organization or its agents "to engage in, or to induce or encourage any individual employed by any person engaged in commerce . . . to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities", or "to threaten, coerce, or restrain any person engaged in commerce" where an object thereof is a "secondary boycott". The Act provides for money damages, including the costs of suit. 29 U.S.C. § 187.

Count IV was a pendent state claim against the International, the District and the Individual Defendants for tortious interference with business relationships.

Count VI, pertaining to punitive damages arising from the allegations of Count IV, was sent to the jury which declined to make such an award.

In essence, the Plaintiff contended at trial that there was a pattern of unlawful picketing, violence, and intimidation en-

6. Were the actions of District No. 5 a proximate cause of damage to the Kerry Coal Company?
Answer Yes

B. *AS TO THE EMPLOYERS OR CUSTOMERS*

7. Did the United Mine Workers (International) threaten, coerce, or restrain Kerry Coal Company, or the trucking companies which hauled Kerry coal, or the customers of Kerry Coal Company, to cease doing business with Kerry Coal Company?
Answer Yes

8. Were these acts of the United Mine Workers (International) done with an object, purpose, or intent to require or force Kerry Coal Company to cease doing business with any other person?
Answer Yes

9. Were the actions of the International a proximate cause of damage to the Kerry Coal Company?
Answer Yes

10. Did the United Mine Workers, District No. 5, threaten, coerce, or restrain Kerry Coal Company, or the trucking companies which hauled Kerry coal, or the customers of Kerry Coal Company, to cease doing business with Kerry Coal Company?
Answer Yes

11. Were these acts of the United Mine Workers, District No. 5, done with an object, purpose, or intent to require or to force Kerry Coal Company to cease doing business with any other person?
Answer Yes

12. Were the actions of District No. 5 a proximate cause of damage to the Kerry Coal Company?
Answer Yes

13. We award as compensatory damages to the Kerry Coal Company the sum of $1,200,-000.00.

*COUNT IV*

14. Has Kerry Coal Company established by clear proof participation in or ratification of violent acts directed against the Kerry Coal Company with regard to its contractual or business relationships, which were a substantial factor in directly causing damage to the Kerry Coal Company, on the part of:

a. United Mine Workers of America (International) Yes

b. United Mine Workers of America District No. 5 Yes

15. Has Kerry Coal Company established by clear proof participation in violent acts directed against the Kerry Coal Company which were a substantial factor in directly causing the damages as claimed, on the part of any of the following individuals?

| | | |
|---|---|---|
| a. | Estel Taylor | Yes |
| b. | Jerry Ashton | Yes |
| c. | James Beachem | No |
| d. | Brian Short | Yes |

16. We award as compensatory damages to the Kerry Coal Company the sum of $1,200,-000.00.

A. Of the above amount, $1,200,000.00 (all) is included in Question 13.

17. In addition to compensatory damages awarded, do you wish to award punitive damages?
Answer No

18. We award as punitive damages to the Kerry Coal Company the sum of $0 (none), against:

| | |
|---|---|
| United Mine Workers of America (International) | No |
| United Mine Workers of America, District No. 5 | No |
| Jerry Ashton | No |
| Estel Taylor | No |
| James Beachem | No |
| Brian Short | No |

gaged in by the Officers and Agents of the International, the District and the various individuals named as defendants, aimed at disrupting and halting the nation's coal supply during the winter of 1977–78 (including Kerry Coal, a non-union operation) to bring about the acceptance of a new contract for the United Mine Workers of America.

The motions presently under consideration here generally allege that there was insufficient evidence to support the verdict; that the damage award is inconsistent with the special interrogatories and against the weight of the evidence; that withholding of documents by the Plaintiff severely and irreparably prejudiced the International and the District; that the admission of certain evidence was severely and irreparably prejudicial; that the Court erred in allowing certain testimony; that the Court improperly questioned witnesses; and that the Court erroneously instructed the jury with respect to the damage award.

Defendants Ashton and Short filed an Amended Motion for Judgment Notwithstanding the Verdict or for New Trial, claiming that the verdict was excessive as a matter of law; that the Trial Court abused its discretion in exercising pendent jurisdiction; and that it was error for the Court not to direct the jury to apportion the damage award.

The International and the District filed a Supplemental Motion for New Trial claiming that the Court erred in admitting certain exhibits into evidence, in refusing to grant their Motion for Mistrial made during the closing arguments, and in refusing to grant their Requests for Points for Charge and Supplemental Points for Charge.

## II. *The Scenario*

The evidence, viewed most favorably to the Plaintiff, indicated that Kerry Coal was a non-union surface coal operation, shipping its coal by rail and truck to industrial and domestic customers in Pennsylvania and Ohio. During the national coal strike by the United Mine Workers, from December 6, 1977 to March 16, 1978, Kerry Coal was operating five sites in Butler, Beaver and Lawrence Counties, Pennsylvania.[2]

The District had a membership of 15,000 and jurisdiction over Washington, Allegheny, Westmoreland, Butler, Mercer and Venango Counties, Pennsylvania. It was split geographically into four Sub-Districts; each Sub-District elected a member to the District Executive Board. Estel Taylor was the Executive Board Member for Sub-District One and District President Louis Antal assigned him to the Enon Valley area (which included Kerry Coal's sites) for the strike.

In November 1977, with a nationwide strike appearing inevitable, and apparently pursuant to a well thought out plan, District President Antal asked International President Arnold Miller to send in one of the International's Organizers, Thomas Pysell, to do a "survey" of the Western Pennsylvania coal fields. In particular, he wanted the non-union coal strippers "surveyed" because "our members kept coming back to us and raising heck that there were all kinds of strip mines popping up over night. And I couldn't go out and look at that, I didn't have the time." (T.237) Mr. Pysell was given responsibility for such a survey in Western Pennsylvania by the Organizing Department of the International. (T.208) Pysell left the area prior to the beginning of the strike, and was thereafter replaced by Jay Kolenc, also an International Organizer. The expense vouchers of Kolenc, P.Ex. 49, indicate that on November 25, 1977 Kolenc met with Pysell to check non-union mines. Kolenc remained in the area, surveying non-union mines, until January 21, 1978.

Steve Segedi, a District Executive Board Member, recalled seeing Pysell and Kolenc in the District offices just prior to the strike, and Segedi, along with John Chach, Estel Taylor and Peter Sabo, other District Board Members, lunched with Pysell and Kolenc. (T.1476, 1502) The expense vouchers of Kolenc, P.Ex. 49, reflected meetings

---

**2.** The five sites were: "Perkins" in Franklin Township, Beaver County; "Leonhardt" and "Ketterer" in Lawrence County; and two in Muddy Creek Township, Butler County.

with District Officers on several occasions, and the telephone records of Estel Taylor, P.Ex. 100C, showed phone calls to Kolenc at the Holiday Inn in Beaver Falls as early as December 6, 1977.

Under date of November 28, 1977, President Antal notified Kerry Coal and its President, Vernon Kerry, as well as every other non-union coal company within the District, that (P.Ex. 11):

"We are aware that you are not maintaining area wage and benefits standards, thereby obtaining an unfair competitive advantage. We demand that you immediately raise your current standards to match those prevailing in the coal mining industry in this area.

We expect to hear from you that you have raised your standards as soon as this has been accomplished. If, in fact, we do not hear from you concerning this matter, we will assume that it is not your intention to raise your standards at this time.

Please reply to me at the above address."

These letters were sent without any knowledge of the wage and benefits standards paid by Kerry Coal and the others except, of course, that they were non-union operations.[3]

On November 30, 1977, a meeting of the District Executive Board was called by President Antal to make preparations for the strike and to draw up "guidelines" for both "strike" and "informational" pickets. Kenneth Yablonski, the attorney for the District, was also present at this meeting and aided in the preparation of the guidelines. Specifically, informational picketing at independent non-union mines was discussed and guidelines presented.[4] The District arranged for the informational pickets to receive $3.00 for meals and, if they drove, 20¢ per mile.[5]

Between December 6[6] and 12, 1977, Vernon Kerry observed men in vehicles driving around his sites, apparently as "surveillance crews". Then, on the morning of December 12th, he received reports by CB radio and by telephone that several thousand dollars worth of damage had been done to a non-union competitor's site (later identified as the Veon site) and, for safety reasons, he shut down all Kerry Coal sites on the morning of December 13th, with the exception of some maintenance crews.

3. Kerry Coal, in fact, had a profit sharing plan, full paid benefits for medical to $250,000, and a long record of no layoffs. (T. 464)

4. These read as follows (P.Ex. 13):
"INSTRUCTIONS FOR INFORMATIONAL PICKETS
Distributed by the United Mine Workers of America for use by its authorized, informational pickets.
As a picket for the United Mine Workers of America you are issued the following instructions concerning informational picket duty. They must be followed to the letter or the union may suffer serious legal consequences:
 1. The only picket signs to be used are those provided by the United Mine Workers of America.
 2. All informational pickets while engaged in informational picketing should carry the picket signs provided by the United Mine Workers of America.
 3. You are to picket only where an authorized representative of the United Mine Workers of America has directed you to perform your picket duty.
 4. If you are asked any questions concerning your picket activity, you should say nothing! You should simply point to the picket

sign and refer all questions to the United Mine Workers of America.
 5. Picketing must be conducted in a peaceful manner. Do not speak to any employees entering or leaving the picketed premises. Do not attempt to stop anyone. You are there to publicize the fact that this coal mine operator is destroying area standards by paying sub-standard wages and benefits.
DO NOT SAY ANYTHING TO ANYONE
DO NOT SHOW THESE INSTRUCTIONS TO ANYONE "
It is interesting to note that picketing was to be carried on only where an authorized representative of the United Mine Workers directed.

5. The District's 1977 Labor Management Report showed payments to pickets at non-union operations of $5,000 in December, and in 1978, $37,833 was paid for picketing of non-union operations in January, February and March.

6. Vouchers for travel by United Mine Workers members revealed five cars containing 16 people. Four cars traveled the same 222 miles, and one traveled 126 miles, on December 6, 1977 in Western Pennsylvania. (P.Ex. 44–1, 2, 3, 4, 5)

After receiving numerous calls for coal from his customers, Vernon Kerry resumed operations on December 20, 1977. It was not long before picketing activity began and, with the activity, acts of intimidation to his employees. Roofing nails were thrown across the entrances to some of the Kerry Coal sites (10 pounds of nails were picked up, T.344), and there was general chaos in the coal fields. On December 27, 1977, Gary Ashton and James Beachem, during the course of scouting activity, threatened Vernon Kerry that if he did not shut down, they would bring in 200 men to wreck his equipment, and Beachem added, "we can do this with one phone call." (T.341, 566) In addition, Ashton, who lived near Kerry Coal's tipple site, picketed the railroad crossing with a sign "UMW on Strike—No Contract—No Work" whenever a train came to pick up coal, and the train would leave. (T.343, 568). This effectively stopped Kerry Coal from shipping coal to its customers. Prior to that time, Kerry Coal had shipped coal on a daily basis (T.341) and 80% of its coal was shipped by rail.

In the beginning, picketing was not continuous but it later became 24 hours a day. (T.343) During the picketing, Vernon Kerry recognized Jay Kolenc, the International Organizer, at the site on more than one occasion.

It was shortly after Christmas and after his encounter with Vernon Kerry, Gary Ashton testified, that he learned Kerry Coal was not going to be closed and called his Local President, Edward Lytle, to obtain help in setting up pickets at Kerry Coal. Lytle said he would get in touch with someone and let him know. The next day, Lytle called and told Ashton he would bring someone to meet him. Ashton stressed he wanted to set up pickets because the strip mines were running. A meeting was arranged at a firehall where Ashton, Beachem and Lytle discussed briefly with Jay Kolenc setting up pickets at Kerry Coal. Kolenc told them there were papers and instructions from the District and that someone would deliver these to him. Later, Estel Taylor, District Board Member, arranged a second meeting at Felix's Bar in Zelienople,

some six or seven miles from Kerry Coal's Franklin Township site. Brian Short appeared at this meeting, and Taylor asked Ashton to "scout" the Kerry Coal operation (Ashton described scouting as seeing what operations were running and who was hauling coal where). After Ashton scouted Kerry Coal, he reported to Taylor that the sites were still operating and another meeting was called at Felix's Bar in which Short and Taylor participated. Taylor gave out the instructions drawn up at the November 30, 1977 meeting (see Footnote 4), and picketing then proceeded on a 24 hour basis from January 5 to January 9, 1978. Ashton remembered seeing Kolenc on this picket line.

During the picketing, the pickets harassed independent truckers bringing the coal to the tipple. On one occasion the pickets stopped a train trying to get into the site, as the train crew refused to cross the picket line.

Brian Short, a past Local President, was a close friend of Estel Taylor and became involved in picketing operations at Kerry Coal, as well as in scouting activities. Prior to establishment of a formal picket line at Kerry Coal (described by Brian Short as one for a period of 24 hours), informational pickets were put at Kerry Coal at Taylor's request. Short said that on one occasion they stopped, milled around the railroad siding, and left. Short considered this to be only informational picketing. On another occasion, Vernon Kerry observed Brian Short's vehicle, a Ram Charger, near the gas pumps on his property. At this time, Short threatened physical violence if Vernon Kerry did not shut down his operations.

Both Short and Taylor recalled Jay Kolenc being on the picket lines. Full time pickets continued until January 9, 1978 and were then withdrawn.

On January 20, 1978, Taylor, Short, and two other United Mine Worker members, Sewoc and Lucas, drove past Kerry Coal's site. Short said he thought Kerry Coal was still working. They drove past Kerry Coal into the Beaver Falls area and breakfasted with Jay Kolenc.

On January 22, 1978, a Sunday morning, at about 8:30 A.M., Vernon Kerry was called to his tipple site because of damage done to his equipment during the night. When he arrived he observed extensive damage to a dragline, three bulldozers, a pan scraper and a fuel tank.[7] Vernon Kerry described the scene as follows (T.351):

"Q. Tell the jury what you saw.

A. Broken windows, smashed turbo-chargers, fuel lines broken, radiators had holes punched in them. Most of the destruction was done with bars or sledges. The radio was destroyed—the two way radio. The controls were smashed. The anti-freeze and the fuel was all over the ground. They had broken lines on the fuel truck and just left the fuel run on the ground. The controls inside of the motor—the motor—the motor—the injector lines on the dragline was smashed. Air cleaners were broken. Most of the controls were broken.

Q. Did you see where any foreign substances had been put into your equipment?

A. At various places on the machinery there is places where oil or fuel can be added to maintain the necessary levels to operate. Inside those areas, you could see where sand and mothballs had been placed. Dirt and sand were placed in the radiator caps where the radiators were completely filled."

At the scene, Vernon Kerry observed tire marks in the new fallen snow which he identified as being made by Brian Short's Ram Charger. He went in search of Short and when he encountered him in an apartment house parking lot in Library, Pennsylvania, Kerry accused Short of "being seen last night". Short's only reply was, "I don't think so". (T.592)

Some replacement parts were not immediately available and the Kerry equipment was not operational for over two months. It was necessary to take production men away from their usual work in order to perform the repairs, and Vernon Kerry hired private security guards.

On January 25, 1978, twelve carloads of pickets came to the Kerry Coal tipple site and, standing shoulder-to-shoulder, completely blocked access to the premises. Vernon Kerry called the state police and while he was waiting for their arrival, two of the pickets came into his office, identified themselves as members of the United Mine Workers, and told him to stop shipping industrial or electrical utility coal during the remainder of the strike. Kerry agreed to do so and testified (T.346):

". . . It was a wise decision on my part because within five minutes there was a caravan came past my office in a show of force. There were some 80 cars in the caravan in addition to the cars that were already at my site."

By the time the state police arrived, the pickets had gone. The police told Vernon Kerry to get his men out of there, expecting the pickets to return. Within about five minutes, the pickets were back but, when they saw the police, only shouted and made gestures.

The coal trucks were followed on many occasions and at one attempted delivery at St. Joe Mineral Company, a regular Kerry Coal customer, on February 27, 1977, pickets threw rocks and damaged these trucks. After the coal was dumped they could not leave because the pickets were swarming at the exit. They finally escaped when they were escorted by the police. This incident ended deliveries to St. Joe Mineral for the period of the strike.

Estel Taylor, District Executive Board Member, acknowledged he had been given the Enon Valley area by District President Antal (the area of Kerry Coal's operations). His calendar of activities showed that he

---

7. The dragline had a 120 foot long boom with a 7 yard bucket attached capable of picking up 40,000 pounds of overburden at one time, and costing $750,000. The bulldozers weighed about 50 tons each and had 16 foot wide by 6 foot high blades on the front. The pan was used for removing and replacing the top soil.

was in that area on January 26, 1978 "performing legitimate official duties".[8] He denied being in the Kerry Coal area during any relevant period of time, although he had been paid by the District for this particular date, and his voucher showed he had been in Zelienople. He acknowledged knowing Jay Kolenc, seeing him at the Kerry Coal site, and meeting him through Ashton to set up the pickets at Kerry Coal, thus contradicting his own testimony.

### A. The Union's Testimony In Plaintiff's Case

Much of the Plaintiff's case was established after lengthy pretrial depositions by calling various union members on cross examination. Vernon Kerry's testimony was thus strongly corroborated and many details added.

The first of these witnesses was Michael Encrapera, who testified that before the strike began, he was asked by District President Antal to become the administrator of a legal defense fund (CMLDF), the purpose of which was to pay fines for the people who would get in trouble over the strike, and the source of this money would be contributions solicited from other mine workers and other unions. District Officers were to announce through the jurisdiction that the District could not pay the fine for those getting into trouble, nor could money be received from the International. Obviously, this was made to prevent any implication of participation by the District or the International, or ratification of any such conduct, contrary to its purpose.

How transparent the situation was could be determined from a letter written by Michael Encrapera and later sent to many other unions by the District, which read as follows (P.Ex. 27):

#### "DISTRICT 5 COAL MINERS

#### THE NEED IS GREAT

#### GIVE

During our contract strike, the Coal Miners Legal Defense Fund (CMLDF) was formed to help District 5 miners who were harrassed or prosecuted. Dozens of miners were arrested on all kinds of criminal charges. As chairman of CMLDF, I arranged for the miners to have free legal representation and I'm proud to tell you that no District 5 miner was sent to jail. However, in some of the hard core anti-union counties, judges imposed huge fines. Many fines have already been paid, but thousands of dollars are still due. If the fines are not paid, the men will go to jail. *District 5 can't pay the fines because if it does, it will be subject to coal company lawsuits and federal prosecution.* These men need help and all coal miners should help them—I urge you to help by giving a generous donation to the CMLDF when a collection is taken at your mine. I promise you as a long time coal miner and union member that all money will be used properly and strictly accounted for.

Fraternally

Michael Encrapera,

Chairman

Coal Miners Legal Defense Fund"

(Emphasis added in original.)

The evidence was clear that Encrapera did pay criminal fines and attorney fees in several instances. For example, there was included a bill for services by Kenneth Yablonski, the District's attorney, for services rendered for Ashton, Short and Beachem, and this bill referred to Kerry Coal Company.

District President Antal acknowledged that he was responsible for insuring that signatories to the Union Contract lived up to their obligations, that the membership enjoyed the rights given to them under the Constitution, and directing whatever was needed in the way of services by various District Board Members to benefit the members. Mr. Antal admitted asking International President Miller to send in an

---

8. The discrepancy of one day between January 25 and January 26, 1978 was never clarified in the testimony. Because of the vagueness of his testimony, the jury could well have concluded that he was in the Kerry Coal area on January 25, 1978.

International Organizer, Thomas Pysell, to survey the non-union strips because Antal's men were complaining of non-union operations in the District's jurisdiction. Antal claimed that Pysell did not give him any report before Pysell left the area prior to the strike.

Antal acknowledged there was an Executive Board meeting on November 30, 1977, when the strike plans were drawn up and the guidelines for informational pickets and union mine pickets were distributed. He said that informational pickets were to be paid $3.00 a meal and, if they drove, 20¢ per mile, and that the District was to pay these expenses. He estimated that approximately $5,000 was spent for non-union pickets during the strike but could not explain the figure of $37,833 in the District's Report to the National Labor Relations Board as having been spent in January, February and March of 1978. Responsibility for the picket lines in each sub-district was on the Executive Board Member of the particular sub-district. Antal disclaimed knowledge of any violence in the area, and particularly denied having seen any newspaper reports of violence in the area, or of having seen the telegram sent by the International on March 8, 1978, addressed to him at District Headquarters, and reading (P.Ex. 66):

"Upon a petition filed by the Regional Director of the National Labor Relations Board, the United States District Court for the Eastern District of Tennessee issued an order enjoining any picketing or any like or related activity, at any non-union mine with whom the International Union does not have a primary labor dispute and any employer under contract with any other union, including trucking companies and railroads. Similar federal court injunctions have been issued in the state of Kentucky and the state of Indiana against several Districts and a number of Local Unions. Therefore, you should advise all the officers and representatives of your District, and all of the Local Unions within your Districts, that they should avoid any such picketing or any other like or any related activity at these types of operations within your Dis-

trict. Full compliance with the policy of the International Union in this regard is of the utmost importance to the integrity and the welfare of our union and its members.

/s/ Arnold Miller
President"

In addition, President Antal denied authorship or knowledge of a press release issued February 22, 1978 by the District which stated (P.Ex. 25):

"On December 6, 1977 when we began our strike, there were very few people who cared about our problem. The industry and the general public thought we were weak and divided. With very few exceptions, we have shown the entire world what coal miners are made of—we won't be broken by any unfeeling and arrogant industry, nor will we be divided from within. There are a few of our members who are bitter because of election defeats both in the District 5 and the International Unions. . . . Those who would depart from our tradition of complete unity during a national strike are traitors to our cause and we, the District 5 Executive Board, so label them. We call on all of our members to remain strong and we will succeed.

We equally condemn irresponsible Congressmen and other politicians who would interfere in our internal affairs. We promise that they will hear from us in the future.

We will continue our program of legitimate informational and other types of picketing. . . ."

It was clear from the evidence that while Antal did not administer the CMLDF, he was fully aware that the funds were being used to pay criminal fines of strikers. For example, P.Ex. 194 was a letter from Antal instructing Encrapera to take care of a criminal fine for a United Mine Workers' member.

The testimony by Ashton and Short corroborated that Jay Kolenc and Estel Taylor were responsible for the men being on the picket lines at the Kerry Coal sites. While

they denied any illegal activity, threats or harassment, their credibility was a question for the jury.

According to James Beachem, and apparently believed by the jury, his only involvement was in scouting the strip mines; and, on one occasion, picketing a railroad siding on the Kerry Coal site (the train had already turned around and departed before Beachem appeared). Thus, the jury found in his favor.

Peter Sabo, Secretary-Treasurer of the District, paid pickets out of the District's General Fund. (T.1199) Many of the vouchers submitted for payment included such descriptive phrases as "shut down trucking" (P.Ex. 44–39); "Kerry Coal tipple" (P.Ex. 44–42); "made check on these strips in afternoon—roving pickets shut them down" (P.Ex. 44–45); "left Bentleyville truck stop at 4:30 A.M. covered three gates at J & L stockpile. There are five altogether. Informed all people entering that UMWA are on strike. We informed them that we would appreciate no coal being moved. No coal moving at 8:30 A.M. when we left." (P.Ex. 44–46). Sabo admitted that the District spent $38,000 to $40,000 on pickets but denied that he had anything to do with the fines, although two of his checks were apparently cashed in a District Magistrate's office for two of his union members. He paid for both the "no contract—no work" signs and the informational picketing signs.

Steve Segedi, a District Executive Board Member, was responsible for Sub-District 2, which included Allegheny, Washington, and parts of Greene and Westmoreland Counties. A miner by the name of Filla was arrested and charged with violence and Segedi discussed the payment of Filla's fine with Encrapera, and sent Filla to him. He made no investigation of the problem but simply referred Filla to the CMLDF. The closeness of the CMLDF to the District was crystal clear.

As was previously noted, Estel Taylor was the District Board Member making the decisions with respect to the picketing at the Kerry Coal site. He made the decision to set up the picket line, and to take it down on January 9, 1978, because of the very cold weather and because intermittent picketing at the railroad siding seemed to be shutting off the rail shipments. He acknowledged that Ashton wanted to get people from his Local to set the picket line up again but was never really told why. (T.1053) He said he rode by the Kerry Coal site on January 20th when he was trying to make up his mind whether to institute the picket line again. Brian Short and two other men were with him, and they discussed the situation with Kolenc. He claims he first became aware of the damage to Kerry Coal's equipment on January 22, 1978 when on that afternoon Short called to tell him of Vernon Kerry's accusations. Taylor also called Ashton, who lived nearby, to find out what he knew about it, but was unable to find out anything.

B. *The Union's Defense on Liability*

Samuel Church, formerly Executive Assistant to International President Miller and Vice President of the International after December 22, 1977, was in active charge of the day-to-day operations of the International after President Miller suffered a stroke in July of 1977. He described the extensive negotiations which started in early October 1977 and lasted until March 16, 1978. He denied any personal knowledge of violence in the District's area, saying that he first learned about it when he came to a District rally held in Soldiers and Sailors Memorial Hall in Pittsburgh on January 30, 1978. (T.1906) He said the strike began December 6, 1977 when there was no contract, in accordance with the United Mine Workers' tradition. While not knowing anything about the violence, he did acknowledge having read the telegram sent to all District Presidents after the Tennessee injunction proceeding. He claimed he first learned about the violence at Kerry Coal when he was informed that an action had been filed and that he would have to give a deposition. He denied any discussion at the International level to try to shut down or disrupt the flow of non-union coal, claiming that if all coal was stopped, it would then

have been a national problem which could be remedied under a Taft Hartley injunction. The International did not want that. Church did, however, acknowledge that Jay Kolenc was an International Organizer and that he had been paid by the International for surveying non-union mines in Western Pennsylvania. (T.1936) Church stated that the International's Report showed that in 1977 Kolenc was paid $20,002.36 in salary and $15,952.05 for expenses, for a total of $35,954.51. (T.1943) The 1978 Report showed he was paid a total of $43,255.79, the second highest amount in the group of 40 employees of the International. He admitted that under the Constitution of the United Mine Workers, the International Executive Board would have the power to remove, or to suspend and/or limit the autonomy of a local union that was not carrying out its legitimate objectives, including imposition of trusteeships on the Districts, but said that no investigation was carried out with respect to the District's activities during the strike. Despite letters being sent to the International Headquarters, Church said no action was taken to insure there would be no United Mine Worker violence at the non-union mines. (T.1990)

III. *Pleadings*

The Amended Complaint filed February 13, 1978, after alleging jurisdiction and identifying the parties, set forth in Count I a cause of action under Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, in that the Defendants, acting in concert, committed an unfair labor practice, a violation of Section 8(b)(4), 29 U.S.C. § 158(b)(4), by forcing Kerry Coal to cease doing business.

Count II was a claim for exemplary and punitive damages for the Defendants' "wanton and wilful" violations of Section 8(b)(4), 29 U.S.C. § 158(b)(4). By order dated June 25, 1979 (with stipulation of counsel), all Individual Defendants were granted summary judgment as to Counts I and II. The Court granted a directed verdict for the International and the District on Count II, at the close of the Plaintiff's case.

Count III alleged a cause under 42 U.S.C. § 1985, in that the Defendants illegally interfered with the Plaintiff's rights to be free from unfair labor practices. By opinion and order of August 10, 1978, Defendants Ashton, Beachem and Short were granted judgment on the pleadings on Count III. By order dated June 25, 1979, Defendants Miller, Antal and Taylor were granted summary judgment as to Count III for the reasons given in our opinion of August 10, 1978. The Court granted a directed verdict in favor of the International and the District on Count III at the close of the Plaintiff's case.

Count IV was a pendent state law claim for violent and tortious interference with existing contracts and existing and prospective business relationships between Kerry Coal and others with whom it did or would do business. The Court granted a directed verdict in favor of Defendant Miller on Count IV at the close of the Plaintiff's case, and granted a directed verdict in favor of Defendant Antal at the close of the case.

Count V alleged that Defendants interfered with the Plaintiff and Plaintiff's employees, and thereby interfered with the rights of such employees to work at their lawful vocation. The Court granted a directed verdict in favor of all Defendants on Count V at the close of the Plaintiff's case.

Count VI was a claim for exemplary and punitive damages for Defendants' wanton and wilfull interference with Plaintiff's contractual relationships. The Court granted a directed verdict in favor of Defendant Miller on Count VI at the close of the Plaintiff's case. The Court, in effect, granted a directed verdict in favor of Defendant Antal on Count VI when it directed a verdict in his favor on Count IV.

IV. *Applicable Law*

A. *Judgment Notwithstanding the Verdict*

A judgment notwithstanding the verdict under Federal Rule of Civil Procedure 50(b) is properly granted if, without weighing the credibility of the evidence, there can be only one reasonable conclusion

as to the proper judgment, and it is contrary to the verdict. *See Thomas v. E. J. Korvette, Inc.*, 476 F.2d 471, 474 (3rd Cir. 1973); *Carpenter v. Koehring Co.*, 391 F.Supp. 206, 208 (E.D.Pa.1975), *aff'd* 527 F.2d 644 (3rd Cir. 1976). The court, as a matter of law, must determine whether the evidence was sufficient to create an issue of fact for the jury, and in doing so, the court may not weigh the evidence, pass on the credibility of witnesses, or substitute its own judgment of facts for that of the jury. Wright & Miller, *Federal Practice & Procedure: Civil* § 2524 at 541–544. The evidence must be viewed in the light most favorable to the party securing the verdict, and all inferences must be drawn in that party's favor. *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793, 796 (3rd Cir. 1978); *Thomas v. E. J. Korvette, Inc., supra.* The jury verdict may be overturned only where the facts and all inferences would not permit a reasonable man to come to the conclusion reached by the jury. *Marder v. Conwed Corp.*, 75 F.R.D. 48, 54 (E.D.Pa.1977).

### B. *New Trial*

■ The court has considerable discretion under Federal Rule of Civil Procedure 59 to order a new trial to prevent a perceived miscarriage of justice, and there are many possible grounds for such a decision. *See generally* 6A *Moore's Federal Practice* ¶ 59.08 (2d ed. 1979). A motion for new trial imposes the duty on the court to insure that the verdict was not influenced by partiality or prejudice, and that there is no miscarriage of justice. *University Marketing & Consulting, Inc. v. The Hartford Life & Accident Co.*, 413 F.Supp. 1250, 1262 (E.D.Pa.1976); *Southeastern Pennsylvania Transportation Authority v. Transit Casualty Co.*, 412 F.Supp. 839, 842 (E.D.Pa.1976). However, the court must not interfere with the verdict unless it is quite clear that the result reached by the jury was seriously erroneous. The credibility of witnesses is a matter for the jury, and a new trial may not be granted merely because the evidence is sharply in conflict, *Barrett v. Robinson*, 65 F.R.D. 652 (E.D.Pa.1975), or because the

jury could have drawn different inferences or conclusions. *Gregory v. South Hills Movers, Inc.*, 477 F.Supp. 484, 487 (W.D.Pa. 1979). In a case such as the one presently before us, it is the function of the jury to determine the credibility of the witnesses, that is, what testimony is to be believed. *See Lind v. Schenley Industries, Inc.*, 278 F.2d 79 (3rd Cir.), *cert. denied* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960).

■ In deciding a motion for a new trial, the court must insure that there is no miscarriage of justice, but at the same time, it must respect a plausible jury verdict. This necessarily involves a commonsense determination, such as that articulated by Wright and Miller: "If, having given full respect to the jury's finding, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial." Wright & Miller, *Federal Practice & Procedure: Civil* § 2806 at 49.

■ Furthermore, a new trial should not be granted on the basis of asserted errors which, in the circumstances, were not prejudicial. *See* F.R.Civ.P. 61. Given these well-known general principles, we turn to the contentions of the Defendants.

### V. *The Motions*

#### A. *The Procedural Problem*

In its Motion for Directed Verdict, made at the close of the evidence, the International asserted two grounds under Count I:

(1) There was no evidence the International coerced or restrained any person, or induced or encouraged any individual employed by any person to engage in a strike or cease doing business.

(2) There was no evidence the International ever engaged in such activity with an object thereof to force any person to cease doing business with any other person. (T.2287)

The Motion for Directed Verdict as to Count IV was based on the grounds that:

(1) There was no evidence pertaining to any violent acts.

(2) There was no proof of authorization by the International. (T.2290–91)

■ Although the International asserted fourteen grounds in its Motion for Judgment Notwithstanding the Verdict filed after the trial, such a Motion may be based only upon the grounds included in its original Motion for Directed Verdict. *See C. Albert Sauter Co. v. Richard S. Sauter Co.*, 368 F.Supp. 501 (E.D.Pa.1973); *Lewis v. Mears*, 189 F.Supp. 503, 509 (W.D.Pa.1960), aff'd 297 F.2d 101 (3rd Cir. 1961), *cert. denied* 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962); 5A *Moore's Federal Practice* ¶ 50.08 at 50–86 (2d ed. 1979). *See also Lowenstein v. Pepsi Cola Bottling Co.*, 536 F.2d 9 (3rd Cir.), *cert. denied* 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334 (1976); *Dudding v. Thorpe*, 47 F.R.D. 565 (W.D.Pa. 1969).

■ Further, on January 14, 1980, more than three months after the verdict and the entry of judgment, Defendants International and District filed a Supplemental Motion for New Trial asserting four additional grounds. This procedure was unavailing to the Movants for this Court may not consider grounds belatedly asserted. *Arkwright Mutual Insurance Co. v. Philadelphia Electric Co.*, 427 F.2d 1273 (3rd Cir. 1970); *Massaro v. United States Lines Co.*, 307 F.2d 299, 303 (3rd Cir. 1962); *Russell v. Monongahela Railroad Co.*, 262 F.2d 349, 354 (3rd Cir. 1958). The district court is without authority to grant a new trial for reasons assigned after the mandatory ten day period under F.R.Civ.P. 59(b). However, none of the reasons assigned have merit, as we will later discuss.

### B. *The International's Motions*

The International first argues that the only evidence against it related to the activities of International Organizer Jay Kolenc, and that these activities were insufficient on which to base liability. It points to the express instructions to Kolenc to "remain on (his) present assignment", which did not include establishing or participating in a picket line. It contends that if Kolenc was merely an employee of the International, the evidence would be insufficient to support the verdict since Kolenc would have been acting outside the scope of his authority.

Kerry Coal, however, contends there was sufficient evidence upon which the jury could base a finding of liability. They point to the fact that Kolenc was employed by the International and was sent into the Western Pennsylvania area to assist or to take over for Thomas Pysell. (P.Ex. 49) He was in constant contact with District Executive Board Member Estel Taylor, and was the person making the decision to establish the picket line at the Kerry Coal site. Kolenc came to Ashton's home, advised Ashton on establishing a picket line at Kerry Coal (T.1851), and directed Taylor to call Ashton to finalize plans for picketing. The plans for establishing the picket line at the rail siding where Kerry Coal's equipment was later destroyed were finalized at the meeting at Felix's Bar which Kolenc attended. Kolenc was at the picket line on several occasions when Plaintiff's employees were threatened and violence occurred. More importantly, on January 20, 1978, one day before Kerry Coal's heavy mining equipment was destroyed, Taylor, Short and other union members again surveyed the Kerry Coal sites and, immediately thereafter, they met with Kolenc. During the evening of the next day, the damage was done to the equipment at the Kerry Coal site. Kolenc left the area a few hours before Kerry Coal's mining equipment was destroyed. (T.1994) Kerry Coal contends Kolenc's connection with the incident is a matter for the jury to determine.

■ In our view, Kolenc's activities could be the basis for the International's responsibility when and if they were committed within the scope of his general authority, whether or not they were specifically authorized or ratified. This is consistent with Section 301(b) and (e) of the Labor Management Relations Act, 29 U.S.C. § 185(b) and (e), which provides in pertinent part:

"(b) Any labor organization . . . shall be bound by the acts of its agents.

\* \* \* \* \* \*

(e) For the purpose of this section in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." [9]

Thus, in *White Oak Coal Co. v. UMW*, 318 F.2d 591, 598 (6th Cir. 1963), *cert. denied* 375 U.S. 966, 84 S.Ct. 484, 11 L.Ed.2d 415 (1964), it is stated:

"The Union was responsible for the acts of their representatives only if the latter were engaged within the scope of their employment or authority; but actual authorization of specific acts was unnecessary."

*See Vulcan Materials Co. v. United Steelworkers*, 430 F.2d 446, 457 (5th Cir. 1970), *cert. denied* 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971); *UMW v. Osborne Mining Co.*, 279 F.2d 716 (6th Cir.), *cert. denied* 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960).

 Kolenc could be found to have exhibited a pattern of conduct in direct cooperation with Estel Taylor, District Executive Board Member, and, if they were acting in concert, they are responsible for each other's conduct and the conduct of each other's agents. *See Vulcan Materials Co. v. United Steelworkers, supra.* Whether Kolenc was acting within the scope of his employment was a question for the jury to determine, and the Court so instructed the jury.[10] *See Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1276 (3rd Cir. 1979) (en banc). No exception was taken to the Court's charge on this matter.

Our case is very different from *Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979), where local labor unions engaged in a number of unauthorized or "wildcat" strikes at petitioner-employer's coal mines in violation of a collective bargaining agreement between petitioner and the respondent international union. The court held that the international and district had no obligation under the maintenance of the integrity of the contract clause to use reasonable means to prevent and end unauthorized strikes because, the Court said, Congress had limited the union's responsibility to cases where the union may be found liable according to the common law rule of agency. In the instant case, there was evidence of Kolenc's extensive and active participation in, and leadership of, the illegal activity. Therefore, *Carbon Fuel* does not support the Defendants' Motion for Judgment Notwithstanding the Verdict in this case.

*Buckeye Power, Inc. v. Utility Workers Union of America*, 607 F.2d 759 (6th Cir. 1979), is also inapplicable. There, a representative of the national union was present at the scene of the strike on the first day of the walkout, and the only evidence of his involvement was that he warned the local union that picketing of the gates was prohibited. This was found to be insufficient evidence of actual involvement and control. The limited involvement by the national's agent in *Buckeye* is in sharp contrast to the role played by Kolenc in the instant case.

 We believe there was sufficient evidence for the jury to have concluded that the International, through the actions of its Organizer Jay Kolenc, induced or encouraged the employees of Kerry Coal, or of the

---

**9.** We note the Supreme Court's discussion in *Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 217, 100 S.Ct. 410, 414, 62 L.Ed.2d 394, 399 n.6 (1979), where the court noted: "Congress applied to unions the common-law doctrine of *respondeat superior* rather than the more restrictive test of union responsibility under § 6 of the Norris-LaGuardia Act, which requires 'clear proof of *actual* participation in or *actual* authorization of, such

acts, or of ratification of such acts after *actual* knowledge thereof.' 29 U.S.C. § 106 (emphasis supplied)."

**10.** Although the duties of Kolenc were never explicitly explained, we believe the jury could reasonably have found that part of his duties included the organizing of pickets and other activity against non-union mines during the strike.

railroad, or the trucking companies to refuse to process, transport or handle Kerry coal with an object thereof to force Kerry Coal to cease doing business, or to force the trucking companies or the railroad to cease processing, handling, or transporting Kerry coal.

 Count IV, the pendent state claim, was based on tortious interference with a contractual relationship, and thus, under Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, clear proof of actual participation or actual authorization of violent acts was required, and the jury was so instructed. The International argued in its Motion for Directed Verdict at the close of evidence that there was no proof of violence and no proof of International authorization. However, the testimony did indicate that threats, obscene gestures, and intimidation occurred on the picket line (T.345), and on January 20, 1978, one day before the Kerry Coal equipment was destroyed, Kolenc met with Estel Taylor and other union members. This was a sufficient basis from which the jury could draw the inference that Kolenc was actively involved in both violent activities on the picket line, as well as in the actual planning of the destruction of the Kerry Coal equipment. Kolenc did not deny his activity.

### C. *District's Motion for Judgment Notwithstanding the Verdict*

 At the close of the evidence, the District moved for a directed verdict. Under Count I they claimed there was no evidence the District coerced or restrained any person, or induced or encouraged any individual employed by any person to engage in a strike or cease doing business, or engaged in such an activity with an object to force any person to cease doing business with any other person. As to Count IV, the District claimed that there was no evidence of violence on its part. The overwhelming evidence however indicated that the District, with the know-how provided by the International Organizers, planned and implemented the campaign to interfere with the production and sale of non-union coal

during the strike, including Kerry Coal, and that Kerry Coal's damages resulted therefrom.

It was District President Antal who wrote the letter to all non-union operators charging that they failed to meet wage and benefits standards. It was also Antal who directed the distribution of picketing instructions to District members, which stated that they were to picket "only where an authorized representative of the United Mine Workers of America has directed you to perform your picket duties . . . You are there to publicize the fact that this coal mine operation is destroying area standards by paying substandard wages and benefits." The District authorized payments for picket duty at non-union operations and paid the pickets some $40,000. Defendant Executive Board Member Estel Taylor was assigned responsibility for strike activity in the area of Kerry Coal's mining sites; he discussed with Kolenc and Ashton Kerry Coal's operation and their intent to stop the movement of coal by Kerry. The District furnished pickets with picket signs, and District Officers directed the attack on Kerry Coal's operation. Taylor ordered the picket line to be manned on a 24-hour basis and was present on the picket line when a coal train was stopped. Taylor signed and approved vouchers for "scouting". Nails were thrown across the entrances to Kerry Coal sites; Kerry Coal's employees, truck drivers, and customers were harassed; United Mine Worker members, paid by the District, mobbed Kerry Coal's tipple and ordered Vernon Kerry to cease hauling coal which brought about the closing of the Kerry Coal operations. Kerry Coal's equipment was destroyed in the early morning hours, just as Ashton and Beachem had threatened. Short's car tracks were seen in the snow on the morning of the day the damage was done; Short did not deny having been involved but only states that he did not think he had been seen. Violence and threats by United Mine Worker members prevented Kerry Coal from shipping to its customer, St. Joe Mineral; again, the pickets there were paid by the District, and these pickets destroyed Kerry Coal's trucks.

The evidence indeed was strong against the District as to its responsibility for the picketing and violence in the area.

### D. *Estel Taylor's Motion*

█ Estel Taylor moved for a directed verdict at the close of the evidence contending that under Count IV there was insufficient evidence to show clear proof of participation in violent acts directed at Kerry Coal which were a substantial factor in causing the damage claimed. We have previously discussed Taylor's participation in connection with the District's Motion. The jury could have found sufficient evidence of Taylor's involvement in violence through his actions in planning and establishing the picket line, by his signing and approving vouchers for scouting activities, and by his contact with Kolenc and Short prior to the destruction of the Kerry Coal equipment.

### E. *Ashton and Short's Motion*

█ In their Motion for Directed Verdict, Defendants Ashton and Short contended there was no proof established as to their participation in violent acts. As to Ashton, the evidence showed he lived near the Kerry Coal's Franklin Township site, and that he urged Kerry's employees to cease working. Later, concerned with Kerry's continuing operations, Ashton and his friend Beachem sought to prevent Kerry's operations and stopped a truck hauling Kerry coal, telling the driver he should advise his employer that, as a sensible man, he should immediately cease hauling. (T.1536–37) Whether this constituted a threat was a matter for the jury to determine.

█ On the same day, Ashton and Beachem confronted Vernon Kerry and threatened if he did not shut down, they would make a phone call and bring in 200 men "to wreck [his] equipment". (T.562) Ashton contacted Kolenc, the International Organizer, and, within a month, the Kerry Coal equipment was destroyed. Late in December 1977, Ashton himself began to picket the Kerry Coal rail siding, and the picket line which Kolenc, Taylor and Ashton had established was characterized by violence and intimidation. Ashton remained in close contact with Taylor, and Taylor phoned Ashton on January 20, 1978, after the surveillance of Kerry Coal's Franklin Township site and the meeting with Kolenc. At 7:18 P.M. on January 21st, Taylor again phoned Ashton and later that evening the mining equipment located just below Ashton's house was substantially destroyed. Ashton maintained that he was asleep until 11 A.M. on Sunday, but the telephone records showed that Taylor spoke with Ashton about 9:26 A.M., after the damage had been done. With this evidence, the jury could well have determined that Ashton employed violence and intimidation to tortiously interfere with Kerry Coal's contractual and business relationships, and his credibility was sorely tested.

█ As to Short, the evidence indicated he met with Taylor, Ashton and Kolenc to plan the picketing. He followed coal trucks and conducted surveillance at the Kerry Coal operation. He confronted Vernon Kerry with the threat of physical violence if Kerry continued to operate, and he was with Taylor during the surveillance of the Franklin Township site on the morning of January 20th and was present at the meeting with International Organizer Kolenc several hours later.

It was finding the tracks of Short's Ram Charger encased in the fresh snow that led Vernon Kerry to accuse Short of having been seen at the site of the damaged Kerry equipment, to which Short replied only "I don't think so." There was no denial of being involved and, instead, after Kerry confirmed that the tracks he saw belonged to Short's vehicle, Short later removed and retreaded the tires. Again, a jury could reasonably have found from this evidence that Short had been involved in tortious and violent interference with Kerry Coal's business relationships.

## VI. *The Damage Award*

### A. *Plaintiff's Method of Calculation*

Kerry's expert accounting witness, James R. Kilzer, a certified public accountant, of the independent accounting firm of Price Waterhouse ("P.W."), holds a Masters De-

gree in Business Administration from the University of Pittsburgh and had four years prior experience as a Cost Analyst for the United States Steel Corporation. Kilzer testified he reviewed Kerry Coal's books and records and determined four types of damage suffered, i. e., (1) lost profits from business interruptions, (2) excess labor costs incurred, (3) lost interest income on profits, and (4) out-of-pocket expenses from the picketing.

As to lost profits—surface mining, a base period of February 1978 (except the 1st and 27th) was considered representative. Kilzer determined from production and sales records the tonnage Kerry Coal could have produced and sold over the strike period (T.1694); the two days (February 1 and 27) were excluded because of the low level of activity on those days. He calculated the profit per ton by determining the "customer mix" (T.1696), i. e., a breakdown of the sales for each customer as the prices per ton varied (T.1698), to which was applied the cost of production as accumulated from the most recent cost records (to September 30, 1977). The final calculation then was the total estimated sales tonnage for the period of the strike, less the amount of tons sold; the customer mix was applied and the lost profit calculated, customer by customer; the lost profits per customer were added to total the lost profits-surface mining.

As to lost profits—auger mining (mining by auger from face of coal done by contractors), since there was no augering in February 1978, a base period of the year before was used (to October 31, 1977). The calculation again was made of lost auger sales tonnage during the strike period against which was applied a cost figure to arrive at lost profit-auger. The month of December 1977 was not included for augering was not scheduled then.

Lost man hours was equated to excess labor cost incurred by Kerry Coal during the strike period, i. e., labor not utilized for productive purposes. Kilzer compared the normal labor cost per ton with the labor cost per ton during the strike. The excess labor cost per ton was multiplied by the number of tons produced during the strike.

Lost interest income was calculated from the amount of money Kerry Coal would have earned on the profits prevented by the strike. Kilzer used the experienced interest rate applied to profits as if received evenly over the period.

Out-of-pocket expenses included expenses for equipment repairs, calculated by adding the invoices for certain replacement equipment and repairs, and the costs of security guards and attorney fees for obtaining a state court injunction.

The damages then developed were as follows:

| | |
|---|---|
| Lost Profits—Surface Mining | $661,167 |
| Lost Profits—Auger | 186,305 |
| Lost Man Hours | 152,631 |
| Lost Interest Income (to 5/1/79) ($28,000 more to 10/1/79) | 90,963 |
| Equipment Repairs | 6,739 |
| Other Expenses | 3,173 |
| Total | $1,100,978 |

The basis of the testimony was that all the coal Kerry Coal could produce would have been sold, and the calculation was made "using the best means available to make the calculations." (T.1755)

B. *Defendants' Damage Testimony*

Defendants called Farrell Rubenstein as their expert witness. Mr. Rubenstein had been an accounting partner of Bachrach, Sanderbeck & Company from 1962 to 1970, at which time the company merged into Touche Ross & Company. Mr. Rubenstein became a member of its National Board of Directors. He reviewed the report and the documentation of Kerry Coal.

Mr. Rubenstein opined that P.W. had insufficient documents on which to base a valid opinion (T.2056); he felt he needed financial statements which would provide production costs during the months following the fiscal year ending September 30, 1977. (T.2128); and he wanted sales history by customer for three years; he faulted the assumption that February 1978 was a proper base month and claimed it was improper to apply costs for a different period (Kilzer said he used a different period because they were the most recent cost fig-

ures available). Rubenstein disagreed with the assumption that augering would have been done in January, February and March, and contended P.W. used the wrong comparative figures.

He concluded that P.W.'s calculations were mathematically correct (T.2143), but that the back-up for the figures were not available since P.W. did not have them either. He concluded the use of February as the base month was solely to enhance the damages. (T.2145)

As to lost man hours, Rubenstein objected to the calculations used of average cost per ton based on the year before instead of the cost in February 1978, which was an unimpaired month. And, as to the non-productive man hours, he objected on the basis that backfilling, one of the non-productive operations performed by Kerry Coal's employees during the strike, is a non-productive cost which was not properly credited. (T.2161). In addition, he claimed that the period immediately prior to the strike was a high activity period when customers were building inventories, and that February was the next period of stockpiling. Thus, Kerry Coal could not have maintained its February sales through the period. Finally, he concluded that no ultimate conclusion could be made as to damages from P.W.'s Report. (T.2180)

## C. The Court's Review

■ The jury could well have found that Kerry Coal was forced to close its mining operations in December 1977 because of United Mine Worker violence in the area. Kerry Coal's employees were later intimidated, trains stopped, truckers harassed, landowners "talked to", and, finally, Kerry Coal's mining equipment so badly damaged that production was seriously affected. Once the Plaintiff established that its business and property were damaged, it is not necessary to prove the exact amount of the damage suffered. It is sufficient if the evidence supports a just and reasonable approximation. Thus, in *Sheet Metal Workers International Association, Local 223 v. Atlas Sheet Metal Co.*, 384 F.2d 101, 109 (5th Cir. 1967), it is stated:

"Section 303 of the NLRA, 29 U.S.C. § 187, permits any person injured in his business or property as a result of a Section 8(b)(4) violation to bring suit to recover the damages he has sustained plus the costs of suit. The statute is compensatory in nature . . ., and damages may only be recovered for actual losses sustained as the result of the unlawful secondary activity. While the employer must prove that he has sustained some injury to his business or property, he need not detail the exact amount of damages suffered. It is sufficient if the evidence supports a just and reasonable approximation. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931)."

■ Kerry Coal succeeded in proving that it was, in fact, damaged as a result of the Defendants' conduct. The testimony of its accountant from P.W. supported its theory of lost profit damage. Given the testimony concerning high demand for coal throughout the strike period and Kerry Coal's use of its actual sales data in computing lost profits, the P.W. damage testimony was entirely proper.

■ Plaintiff's P.W. expert testified to the selection of February 1978 as the base period, giving a very detailed explanation of his reasons for so doing. He calculated the losses as $1,100,978, and said his figure was conservative, not including $28,000 interest to date of trial. We cannot see in this calculation where there is any seriously erroneous result reached by the jury. Defendants contend that the Kerry Coal damage is dependent upon an express finding of business interruption during every day of the strike. But Kerry Coal's theory of damages was based on a course of conduct which was to cause a decrease in the level of monetary return. Whether the damages were attributable to customer decisions to cancel or curtail orders in the face of widespread United Mine Worker violence and intimidation would not lessen Kerry Coal's right of recovery. Kerry Coal's theory of damages assumed only that it would have sold as much coal during the strike period

as it did during the February base period, if the Defendants had not interfered with its operations. The validity of the base period was a matter for the jury.

## VII. *The Special Arguments*

### A. *The Discovery Claims*

■ This Court has carefully reviewed Defendants' contention that the Court prevented them from inquiring into the substance of Kerry Coal's damage claims during discovery. We find this argument to be without merit.

Plaintiff, on March 5, 1978, filed a comprehensive statement of monetary damage, including a six-page letter from its damage expert relating to the methodology used in calculating damages and a 13-page document detailing the calculation. Defendants were thus apprised of the nature of the monetary damage claimed by Kerry Coal substantially prior to trial. Further, Plaintiff made available to Defendants' counsel on April 5, 1978 all the business records intended to be marked as exhibits. On May 10, 1978, this Court heard argument on Defendants' Motion to Exclude certain of these business records at trial which Kerry Coal had not produced. Over the Plaintiff's objections, this Court ordered Kerry Coal to produce all documents reviewed by its expert witness. These were thereupon produced. Thus, the Court went the full distance required by the law to compel, prior to trial, the complete disclosure of the methodology and calculations of Kerry Coal which the Defendants could be expected to meet at trial.

### B. *The Evidentiary Rulings*

■ The Defendants contend that the Court erred in permitting District Executive Board Member Steve Segedi to testify that the District was instrumental in securing payment for arrested District members.

The evidence showed that Segedi was aware of the arrest of his friend, Gerald Filla, for dumping trucks loaded with non-union coal. Filla advised Segedi that he had been fined and Segedi sent him to Michael Encrapera, the Administrator of the CMLDF, and instructed Encrapera to make a check payable to Anna Shriner to cover Filla's fine. Segedi admitted approving vouchers to reimburse Filla for following coal trucks going to a zinc works in Burlington; this is where Filla was arrested. The proof was relevant to the relation between the District and the CMLDF, which was used to pay Filla's fine at Segedi's direction. It was also admissible as ratification of specific acts of strike violence.

■ The Defendants contend that the Court erred in admitting Plaintiff's Exhibits 70 and 71. Plaintiff's Exhibit 71 is a letter, dated January 31, 1978, from the General Counsel of the National Labor Relations Board, John Irving, to Harrison Combs, General Counsel of the International, alleging involvement of the International Executive Board members, agents and employees in illegal activity at non-union mines. Sam Church, the Vice President of the International, and the man in charge of the day-to-day operations of the union, denied ever seeing this letter, but the authenticity of the letter had been admitted and the only objection related to relevancy. Clearly, the letter was relevant. Plaintiff's Exhibit 70 was also a letter, dated February 2, 1978, from Willard Owens, Associate General Counsel of the International to John Irving. Both of these letters related to the activities of the International and the International's knowledge with respect to activities being conducted against non-union mines during the strike. Sam Church, as noted, on behalf of the International, denied any such knowledge, as had District President Antal before him. At this point, the Court ruled they were relevant to the determination of that issue. Since both bore direct relationship to knowledge by the chief administrative officers of each, these exhibits were used to impeach the credibility of these assertions. Accordingly, the Court did not err in admitting into evidence Plaintiff's Exhibits 70 and 71.

### C. *The Veon Coal Company Incident*

■ Defendants allege error in permitting cross examination of Estel Taylor as to

his knowledge of violence at Veon Coal Company, a competitor of Kerry Coal. The questioning was permitted after Vernon Kerry had testified that he had heard about violence at a competitor's operation, to show his frame of mind concerning the necessity of closing his own operations. (T.337) The examination of Estel Taylor was not assuming the facts of any violence, but was simply to show that he had heard of this violence as well, so that it was not just a figment of Vernon Kerry's imagination. The Defendants cannot possibly assert that admission of this evidence was "to instill in the jury's mind the fact that the equipment at Veon was destroyed." The evidence was relevant to the testimony of Vernon Kerry, and the necessity of the December work stoppage.

### D. The International's LM–2 Report

■ The International argues that it was error to admit into evidence the International's Labor Management Year End Report which showed a contingency litigation fund of $8,000,000. In the first place, the Report was admitted into evidence without objection (T.1938) and cross examination of Sam Church with respect thereto was done without objection. Furthermore, this fund was established early in 1977, before the strike began and was relevant to the relationship of the International to the expected activities of its members.

### E. The Testimony that Plaintiff's Employees were Afraid

■ Defendants have alleged that the Court erred in overruling their objection to Vernon Kerry's testimony that his employees were afraid; counsel objected to testimony as to the emotional or mental state of people that were not at trial to testify. The contention is that there was no exception to the hearsay rule which would permit such testimony. However, Vernon Kerry was testifying concerning his own observations of the physical and mental condition of his employees, based upon his first-hand knowledge of how they were acting. This is clearly not hearsay. *Sunderland v. Pitts-*

*burgh & Lake Erie Railroad*, 344 F.2d 960, 961 (3rd Cir. 1965) (per curiam); *see also Cole v. United States*, 327 F.2d 360, 361 (9th Cir. 1964). Thus, Vernon Kerry's testimony was admissible.

### F. The Court's Participation in Interrogation of Certain Witnesses

Under Fed.R.Evid. 614(b), "the Court may interrogate witnesses, whether called by itself or by a party."

■ The Court assiduously throughout this lengthy trial, covering 16 days and with a transcript of 2636 pages, interjected questions where it considered that matters were not clear to the jury. An examination of the record, we believe, will indicate no such questioning as is claimed by the Defendants. The objection was made in regard to questions asked of Brian Short after he had testified he had not been subject to anyone's direction in setting up the picket line, particularly from the District or the International. Earlier, the Court had understood Short to say, and understood Estel Taylor to say, that there was no question that the District, through Taylor, had ordered the picket line to be set up, and that it had been done directly at District President Antal's request and at Taylor's direction, and that they had ordered Short to do it. While Short was on the stand and subject to cross examination of counsel for the International and in the context as above set forth, the Court asked the following questions (T.1333–34):

> "Court: Let me just ask, didn't you say that the picket line was set up, the formal picket line, on directions of Mr. Taylor. Wasn't it Mr. Taylor that determined that the picket line should go up?
>
> Witness: Yes sir.
>
> Court: Well, who is Mr. Taylor associated with? What was his position?
>
> Witness: Are you asking me, your Honor?
>
> Court: Surely. You are the one that is on the witness stand.
>
> Witness: OK. He is the District Board Member, sir.

Court: Where?

Witness: At District 5.

Court: Alright."

The following discussion then took place between the Court and Counsel for the International (T.1334–35):

"Counsel: I don't understand, your Honor. I never asked him whether anybody from District 5 ever told him to picket or not. I asked him about an International representative or anybody from the International telling him to picket.

Court: And you also said District 5.

Counsel: Oh no, not with regard to picketing. I asked him with regard to ___

Court: Well, the jury will recall the testimony. It will be for the jury to remember what the testimony was."

These questions were certainly proper in every respect. They were necessary to bring out matters which were important and which had not been sufficiently touched on by counsel. *See United States v. Stirone,* 311 F.2d 277, 279 (3rd Cir. 1962), *cert. denied* 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1963); *United States v. Ostendorff,* 371 F.2d 729, 732 (4th Cir.), *cert. denied* 386 U.S. 982, 87 S.Ct. 1286, 18 L.Ed.2d 229 (1967). In addition, this was apparently an afterthought since it was not brought to the Court's attention until the next day, which, by the express terms of Fed.R.Evid. 614(c), was untimely.

### G. *Plaintiff's Counsel's Closing Arguments*

Plaintiff's counsel had stated "The Veon Coal Company, right next to the Kerry Coal Company, was hit with violence on December 12. We closed down December 13. Short was at Veon. Taylor was at Veon. We have to—then they destroyed Veon's equipment and he tells you there's no causal relation between us closing on the 13th and what went on at Veon." (T.2560) It is true, as Kerry's counsel argues, that he did not say that either Short or Taylor were at Veon when the equipment was destroyed. Counsel merely stated they had been at Veon, and this is borne out by the record. Taylor admitted he was present at

Veon during the strike (T.798, 1293, 1366) and admitted he was aware of violence at Veon. The contention that the Plaintiff's closing gave a wrong impression is of no merit.

### H. *Defendants' Objections to the Special Interrogatories*

The International and the District argue that the Court erred in submitting special interrogatories 1, 2, 4, 5, 7, 8, 10 and 11 to the jury, in failing to require the jury to identify with whom it was the Defendants' object to force the Plaintiff to cease doing business. Objection on these grounds was only obscurely raised during the discussion on the points for charge and it need not be considered now. *See C. Albert Sauter Co. v. Richard S. Sauter Co., supra.* Thus, in *Chuy v. Philadelphia Eagles Football Club, supra,* the defendant, in a motion for new trial, argued that the special interrogatories were misleading and contained improper and inadequate instructions. The court held that this issue was not before it because specific objections to the interrogatories were not properly made prior to their submission to the jury.

In any event, the objections to the instant interrogatories are wholly without merit. Interrogatory 1, set forth previously, focused on whether or not the International induced or encouraged the employees of Kerry Coal, or of the trucking companies, or of the railroad to refuse to process, transport or handle Kerry coal. In Interrogatory 2, the jury was asked to determine whether the object of that conduct was to force Kerry Coal to cease doing business, or the trucking companies, or the railroad to cease transporting or handling Kerry coal. Interrogatories 4 and 5 asked similar questions as to the District.

The Defendants' objection assumes that the jury could have found that the Defendants forced Kerry Coal to cease doing business without finding that it could have been forced to cease doing business with any other person. Particularly in light of the Court's instructions (T.2587–89), con-

fusion could not possibly have resulted and the Defendant's objections are groundless.

In this regard, we consider Ashton and Short's contention that the answers of the jury to the special interrogatories were so inconsistent as to require the granting of a new trial. This issue was raised for the first time in the Defendants' Amended Motion for Judgment Notwithstanding the Verdict or for New Trial and need not be considered. *See Arkwright Mutual Insurance Co. v. Philadelphia Electric Co., supra.* The Defendants argue that the jury's answer to Special Interrogatory 16A is inconsistent with the other answers. The Court had instructed the jury (T.2610–11) that the damages awarded in Interrogatory 13 under Count I should not be added with the damages awarded under Count IV, in order to come up with the answer to Interrogatory 16, saying: "What you must find is the compensatory damage due under each one." The Defendants assume that the 1.2 million dollars are for damages which could not be awarded under Count I. However, the jury's answers to the Special Interrogatories do not support that assumption. The Special Interrogatories did not request the jury to specify the type of damages, nor did Defendants Ashton and Short request such a breakdown. Their assumption that the jury, by awarding the same amount under Count I and Count IV, awarded damages for non-violent activity under Count IV is wholly at odds with the jury's answers to Special Interrogatory 15. The Defendants admit that the jury's answers are susceptible to different interpretations. There is a perfectly consistent interpretation that may be given to the answers as hereinabove set forth.

I. *Defendants Ashton and Short's Objection to Plaintiff's Exhibit 197A*

■ Defendants Ashton and Short have objected to the admission of Plaintiff's Exhibit 197A (referred to by their counsel as P–196), a bill submitted by their counsel to the District's CMLDF. Relevance is questioned as Michael Encrapera, the Fund's Administrator, had testified that the CMLDF did not consist of the District's

money; furthermore, even if the District was the source of the funds, the evidence would not be relevant. These Defendants also object to the admission of the bill as being highly prejudicial, confusing or misleading. *See* Fed.R.Evid. 403.

District President Antal testified that he had requested his longtime friend and United Mine Worker Member, Michael Encrapera, to establish the CMLDF in anticipation of the strike. Much of the money sent directly to the District's Strike Fund and to the International was diverted to the CMLDF. Antal and other District Board Members on occasion asked Encrapera to "take care of" various problems which were encountered. It was thus for the jury to decide if the CMLDF was a separate fund, or if it was a method used by the District to take care of the criminal fines of its members who got into trouble. The payment of Ashton and Short's legal fees by the District aided the jury's understanding of the relationship of the District to the violence, particularly in light of the fact that the CMLDF was set up before the strike even began.

At trial, counsel never objected to the bill on the grounds set forth in Fed.R.Evid. 403, but asserted that the bill was not relevant to the facts in issue and was subject to an attorney-client privilege. (T.128, 130) The Defendants chose not to press objection to a bill paid by a third party on the grounds of attorney-client privilege, nor could they. There was thus no error in admitting the bill.

J. *The Apportionment of Damages*

■ Defendants Ashton and Short contend that the Court erred in refusing to apportion damages among the Defendants. This issue as such was first raised in Defendants' Amended Motion and would not need to be considered by the Court. *Arkwright Mutual Insurance Co. v. Philadelphia Electric Co., supra.*

Prior to the charge of the Court, the parties were advised of the charge and Ashton and Short vaguely objected because of the potential for joint and several liability; however they did not propose any points for

charge with respect to the apportionment of damages. *See Frankel v. Burke's Excavating, Inc.*, 269 F.Supp. 1007 (E.D.Pa.1967), aff'd 397 F.2d 167 (3rd Cir. 1968) (holding that alleged defects in special interrogatories could not be the basis for a new trial when counsel had not pointed out the alleged defect to the court).

In any event, under Section 433(b), Restatement 2d of Torts, it is provided:

"(1) Except as stated in Subsections (2) and (3), the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff.

(2) Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

(3) Where the conduct of two or more actors is tortious and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon such actor to prove that he has not caused the harm."

Section 433(b) has been adopted in Pennsylvania. *Sommers v. Hessler*, 227 Pa.Super. 41, 323 A.2d 17 (1974).

The jury apparently found that the Plaintiff had established by clear proof participation in violent acts by the Defendants Ashton and Short against Kerry Coal which were a substantial factor in directly causing damage. (Special Interrogatory 15) Defendants Ashton and Short cannot now argue that the verdict against them should be overturned because the damages were not apportioned, when it was their burden to convince the jury of the appropriateness of such apportionment and to propose applicable jury instructions to the Court. This they failed to do.

### K. *Plaintiff's Pendent Claims Against Ashton and Short*

 In their Amended Motion for Judgment Notwithstanding the Verdict or New Trial, Defendants Ashton and Short raised the ground that this Court abused its discretion in exercising pendent jurisdiction over Plaintiff's claims against them.

There was a substantial federal claim asserted against the International and the District. The alleged activities of the Individual Defendants, which formed the basis of the pendent claim, were an integral part of this substantial federal claim. Thus, consistent with *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976) and *UMW v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), we think the Court could exercise pendent jurisdiction over the state claims against the Individual Defendants arising out of a common nucleus of operative fact.

Furthermore, we think the Court properly exercised its discretion in retaining jurisdiction over the pendent state claims. Summary judgment was granted on the Plaintiff's federal claims against Ashton and Short on June 25, 1979, almost one and a half years after the filing of the Plaintiff's Complaint and just a couple of months prior to trial. A review of the record clearly discloses that Ashton and Short would have been called in this action against the other Defendants, even if the Court had dismissed the pendent claims against them. The same facts would have been introduced into evidence and in the interests of judicial economy and convenience, the Court was warranted in exercising its pendent jurisdiction. *Transok Pipeline Co. v. Darks*, 565 F.2d 1150, 1154–55 (10th Cir. 1977), *cert. denied* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). *See also Boudreaux v. Puckett*, 611 F.2d 1028 (5th Cir. 1980).

### VIII. *Conclusion*

The Court has reviewed the Motions for Judgment Notwithstanding the Verdict and has concluded that the evidence was sufficient for the jury to reasonably find, without resort to prejudice or guess, that illegal picketing and violence in the coal fields in Western Pennsylvania was brought about by the International and the District, participated in by officials acting within the

scope of their employment, and by the Individual Defendants as determined by the jury. Therefore, the Motions for Judgment Notwithstanding the Verdict will be denied.

We have also examined the Motions for New Trial alleging that the verdict was against the evidence, and in particular have concluded that the jury's verdict was not only permissible under the evidence, but was strongly indicated thereby. In other words, there was no seriously erroneous result when leaving to the jury the determination of the credibility of the testimony, what testimony was to be believed, and the inferences that it should choose to deduce therefrom. Thus, the Motions of all Defendants for New Trial will be denied.